929 F.2d 1449
 13 ITRD 1361, 21 Envtl. L. Rep. 20,843
 EARTH ISLAND INSTITUTE, a California nonprofit corporation;
Marine Mammal Fund, a California corporation;
David R. Brower, Plaintiffs-Appellees,
v.
Robert A. MOSBACHER, Secretary of Commerce; John Knauss,
Dr., Administrator, National Oceanic and Atmospheric
Administration; William W. Fox, Jr., Assistant
Administrator, National Marine Fisheries Service; Nicholas
F. Brady, Secretary of the Treasury, Defendants-Appellants.
 No. 90-16581.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 14, 1991.
Decided April 11, 1991.
 
 Albert M. Ferlo, Jr., U.S. Dept. of Justice, Washington, D.C., for defendants-appellants.
 Joshua R. Floum, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for plaintiffs-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before SCHROEDER, CANBY, and NOONAN, Circuit Judges.
 SCHROEDER, Circuit Judge:
 
 
 1
 The government appeals from a preliminary injunction entered October 19, 1990, which enjoined the importation of yellowfin tuna from Mexico. The plaintiffs who sought the injunction are the Earth Island Institute, the Marine Mammal Protection Fund and David Brower, environmentalist (collectively termed "Earth Island"), all concerned with the enforcement of the Marine Mammal Protection Act ("MMPA" or "Act"). Congress amended the MMPA in 1988 to enhance protections for dolphins that were being killed in large numbers as a result of tuna fishing. See 16 U.S.C. Secs. 1361-1407; Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668, 670 (9th Cir.1988). The district court granted the injunction because it concluded that the Secretary of Commerce had not made a positive finding, as required by the Act, that Mexico had met the applicable standards regarding the incidental killing of dolphins. We affirm.
 
 
 2
 Congress enacted the MMPA in 1972 to address, among other problems, the tremendous number of dolphins killed by the purse seine method of fishing for yellowfin tuna in the eastern tropical Pacific Ocean. For unknown reasons, yellowfin tuna swim below schools of dolphins in that area. Thus, fishing vessels often set their purse seine nets on dolphins to catch the tuna below. The dolphins are frequently killed or maimed in this process. In the early 1970s, the United States fishing fleet was responsible for the slaughter of over 300,000 dolphins annually. 134 Cong.Rec.S. 16336, 16344-45 (1988).
 
 
 3
 Although the Act brought about a material reduction in the number of dolphins killed by the United States fleet, dolphin slaughter by foreign nations remained a growing problem. By amendments to the Act in 1984 and 1988, Congress enacted specific standards intended to ensure that foreign tuna fishing fleets would reduce the number of dolphins killed and to protect certain endangered subspecies of dolphins. Such subspecies included the eastern spinner dolphin which is the subject of this lawsuit. The weapon Congress chose to bring about such reductions in killings was a mandatory embargo on the importation of yellowfin tuna to be imposed upon those countries whose fleets failed to meet the standards Congress established.
 
 
 4
 The statute mandates the Secretary of the Treasury to ban imports of yellowfin tuna products from a foreign nation until the Secretary of Commerce certifies that that nation's incidental kill rate of dolphins is comparable to that of the United States. The statute specifies that the total incidental kill rate of a foreign nation shall not be found comparable unless it is no more than 2.0 times the total incidental kill rate of the United States fleet. 16 U.S.C. Sec. 1371(a)(2)(B)(ii)(II). With respect to the eastern spinner dolphin, the statute additionally provides that the total number of eastern spinner dolphins killed by a foreign fleet cannot exceed fifteen percent of the total number of mammals killed by the fleet of that country. 16 U.S.C. Sec. 1371(a)(2)(B)(ii)(III).
 
 
 5
 The portion of the statute with which we must be concerned provides as follows:
 
 
 6
 The Secretary of the Treasury shall ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards. For purposes of applying the preceding sentence, the Secretary--
 
 
 7
 . . . . .
 
 
 8
 (B) in the case of yellowfin tuna harvested with purse seines in the eastern tropical Pacific Ocean, and products therefrom, to be exported to the United States, shall require that the government of the exporting nation provide documentary evidence that--
 
 
 9
 . . . . .
 
 
 10
 (ii) the average rate of that incidental taking by the vessels of the harvesting nation is comparable to the average rate of incidental taking of marine mammals by United States vessels in the course of such harvesting, except that the Secretary shall not find that the regulatory program, or the average rate of incidental taking by vessels, of a harvesting nation is comparable to that of the United States for purposes of clause (i) or (ii) of this paragraph unless--
 
 
 11
 . . . . .
 
 
 12
 (II) the average rate of the incidental taking by vessels of the harvesting nation is no more than 2.0 times that of United States vessels during the same period by the end of the 1989 fishing season and no more than 1.25 times that of United States vessels during the same period by the end of the 1990 fishing season and thereafter;
 
 
 13
 (III) the total number of eastern spinner dolphin (Stenella longirostris) incidentally taken by vessels of the harvesting nation during the 1989 and subsequent fishing seasons does not exceed 15 percent of the total number of all marine mammals incidentally taken by such vessels in such year....
 
 
 14
 16 U.S.C. Sec. 1371(a)(2)(emphasis supplied). The statute authorizes the National Marine Fisheries Service ("NMFS" or "agency") to promulgate regulations implementing its provisions. 16 U.S.C. Secs. 1373 & 1382.
 
 
 15
 This dispute arises from a NMFS regulation promulgated March 26, 1990. This regulation provides that foreign countries must supply data to the NMFS by July 31 of each year regarding the number of dolphins killed during the previous calendar year. Thus, on July 31, 1990, data was due for 1989. 50 C.F.R. Sec. 216.24(e)(5)(iv). The controversial portion of the regulation is the further provision that if a foreign nation has exceeded the limitations for a given year, and therefore remains under the embargo, the Secretary may nevertheless "reconsider" the embargo and certify compliance with the statute's provisions based upon data for only the first six months following the year the limits were exceeded.[1]
 
 
 16
 The events giving rise to the preliminary injunction in this appeal are as follows. On June 25, 1990, Earth Island filed its first motion for a preliminary injunction in the federal district court for the Northern District of California. Earth Island sought an "interim" embargo which would enjoin the importation of yellowfin tuna products pending NMFS' issuance of the comparability findings required by the MMPA as to the total number of dolphins killed and the percentage of eastern spinner dolphins killed by foreign fleets fishing for yellowfin tuna. Earth Island argued that, by the plain terms of the MMPA, an embargo was mandatory and the agency could not authorize imports until the requisite comparability findings were made; therefore, it argued, the agency was required to impose an embargo until after the relevant data had been reviewed. The agency countered that it needed several months to compile and analyze data from the previous year and the MMPA did not require it to take action until it had done so.
 
 
 17
 On August 28, 1990, the district court granted the preliminary injunction, on the ground that the agency had not made the finding required with respect to total kill comparability.[2] On September 6 the government ostensibly imposed the embargo ordered by the district court. The very next day, however, NMFS made the required comparability findings and lifted the embargo for Mexico, despite the fact that Mexico had exceeded the limits for both total dolphins killed and percentage of eastern spinner dolphins killed for 1989. NMFS based its decision to lift the ban on the reconsideration regulation at issue here. On the same day that NMFS determined that Mexico had exceeded the MMPA limits for 1989, it also determined that Mexico was within the limits on killing eastern spinner dolphins for the first six months of 1990. It is difficult to understand how the government could issue a favorable determination in this case in less than two weeks when it had previously argued that it needed at least six months to collect and analyze data from foreign nations.
 
 
 18
 On September 17, 1990, Earth Island applied for a temporary restraining order banning the import of yellowfin tuna from Mexico. Earth Island argued that NMFS had already found that Mexico had violated the eastern spinner kill comparability requirements for 1989, and that, under the plain language of the statute, the comparability finding for the eastern spinner dolphin limit must be based on an entire year of data.
 
 
 19
 On October 4, 1990, the district court granted the TRO. The district court held that the regulation allowing "reconsideration" of the 1989 embargo based on only six months of 1990 data violated the language and purpose of the statute and was thus beyond the agency's authority. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). The district court held that a year's data was required by the clear language of subsection III: "The Secretary of the Treasury shall ban the importation of ... yellowfin tuna ... unless ... the total number of eastern spinner dolphin (Stenella longirostris) incidentally taken by vessels of the harvesting nation during the 1989 and subsequent fishing seasons does not exceed 15 percent of the total number of all marine mammals incidentally taken by such vessels in such year." Since the comparability finding for eastern spinner dolphins must be based on an entire year of data, and the limit was exceeded for 1989, the most recent year for which data were available, the court concluded that the embargo required by the 1989 data had to remain in effect until an evaluation of the data for all of 1990 demonstrated that the kills fell within the tolerated limits established by Congress.
 
 
 20
 On October 19, 1990, the court, at the government's request, converted the TRO into a preliminary injunction, and the government filed this appeal.[3] The government challenges the district court's order on several grounds. The questions presented are essentially questions of law involving interpretation of the MMPA. Because we see no basis for overturning the district court's ruling, we affirm.
 
 
 21
 The government's primary argument is that the six-month "reconsideration" provision is within the discretion delegated by Congress to the agency for regulatory implementation of the Act. The government points to the deference the courts owe to agencies in matters of statutory interpretation. See, e.g., Chevron, 467 U.S. at 844, 104 S.Ct. at 2782 ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer"). The difficulty with this position is that agencies do not have discretion to issue regulations which conflict with statutory language and congressional purpose. Id. at 842-43, 104 S.Ct. at 2781-82. This regulation clearly does.
 
 
 22
 The only textual support that the government advances for its position is the absence of any specific prohibition of "reconsideration" upon less than one year's data. The government argues that the lack of any explicit prohibition allows the agency to adopt an interpretation of the MMPA which permits such reconsideration. We reject this argument because the statute does require findings to be based on a full year's data. As the district court recognized, the language of the statute is clear; it requires an embargo unless "the total number of eastern spinner dolphin (Stenella longirostris) incidentally taken by vessels of the harvesting nation during the 1989 and subsequent fishing seasons does not exceed 15 percent of the total number of all marine mammals incidentally taken by such vessels in such year." 16 U.S.C. Sec. 1371(a)(2)(B)(ii)(III) (emphasis added); see also Marine Mammal Protection Act Amendments of 1988, S.Rep.No. 592, 100th Cong., 2d Sess. 6 (1988) [hereinafter S.Rep. No. 100-592] (referring to "annual quota" of dolphins killed). In the face of such a clear directive, the regulation in question is invalid.
 
 
 23
 The government also suggests that regardless of the language used in the statute, the reconsideration provision should be upheld as a matter of policy because it offers an incentive to foreign countries to speed up their efforts to meet the statutory standards. The record in this case belies the existence of any incentive effect. The record demonstrates that the six-month reconsideration allows foreign nations and NMFS to withhold the release of negative findings until they have available a subsequent set of positive findings, as occurred with the 1989-90 data for Mexico. The result in this case was that Mexico, which had exceeded MMPA standards for an entire year, was subject to embargo for less than one day. Under this regulation, foreign nations could thus continually exceed MMPA limits for part of each year, yet never be subject to the ban. Because the reconsideration regulation creates such a potential for abuse, and has in fact already been used to circumvent the intent of Congress, we reject the government's argument that the reconsideration regulation offers a more effective incentive to foreign countries to reduce dolphin kill rates.
 
 
 24
 The agency's contention that it seeks only to provide additional incentives consistent with Congress' intent is further belied by the agency's own record of non-enforcement of congressional directives during the years which preceded the 1988 amendments. In enacting those amendments, Congress expressed its concern that the NMFS was not holding foreign vessels to U.S. dolphin protection standards. The agency's lax record of promulgating and enforcing standards for foreign fleets was alluded to repeatedly in the legislative history. The Senate Committee on Commerce, Science & Transportation pointed out that "[w]hile the U.S. industry has made dramatic improvements since enactment of the MMPA, unregulated tuna fleets of foreign nations now present a far more serious source of porpoise mortality." S.Rep. 100-592 at 7. The Senate Committee also stated:
 
 
 25
 While the Committee is disappointed that the interim final regulations implementing the 1984 comparability amendments to the Act were issued only recently, it expects that these new amendments will be incorporated into the final regulations immediately. Recognizing that the foreign fleets harvest 60 percent of the yellowfin tuna in the [eastern Tropical Pacific] but kill 80 percent of the porpoise, the Committee intends these new requirements to reduce the foreign take of marine mammals, similar to those reductions made by the U.S. fleet.
 
 
 26
 100 S.Rep. 100-592 at 25. Individual members of Congress were more severe in their criticism of NMFS' performance. Senator Hollings, referring to the 1984 amendments, said, "[T]he national marine fisheries service has failed to implement these requirements adequately." 134 Cong.Rec.S. 16336, 16344 (1988). According to Senator Adams, "[T]he administration has been inexcusably lax in implementing these laws." Id. at 16341. There is no basis in the history of the enforcement of the Act for us to conclude that the agency's policies are aimed at more stringent enforcement of Congressional policy.
 
 
 27
 Because the government's position is at odds with both the language and the purpose of MMPA, and the agency's intended role under it, we affirm the district court's order of October 4.
 
 
 28
 AFFIRMED.
 
 
 
 [1]
 The regulation states:
 The Assistant Administrator may reconsider a finding upon a request from and the submission of additional information by the harvesting nation, if the information indicates that the nation has met the requirements.... [T]he additional information must include data collected by an acceptable observer program which demonstrate that the nation's fleet marine mammal mortality rate improved to the acceptable level during the period including at a minimum January 1 through June 30 of the year following the year in which the nation's mortality rate was found to exceed acceptable levels.
 
 
 [50]
 C.F.R. Sec. 216.24(e)(5)(viii), 55 Fed.Reg 11,929 (Mar. 30, 1990)
 
 
 [2]
 The district court's interpretation of the total kill comparability portion of the statute, 16 U.S.C. Sec. 1371(a)(2)(B)(ii)(II), both in the August 28 order and the October 4 order, is not before this court in this appeal, and we express no view as to the correctness of its interpretation of that provision
 
 
 [3]
 On November 14, 1990, a motions panel of this court granted the government's motion for emergency stay pending appeal and expedited the appeal