**EARTH ISLAND INSTITUTE, et al., Plaintiffs,**

v.

**Ronald H. BROWN, et al., Defendants.**

**American Tunaboat Ass'n, et al., Intervenor–Defendants.**

**No. C88–1380 TEH.**

United States District Court, N.D. California.

Jan. 27, 1994.

**1366**

Michael L. Charlson, Heller Ehrman White & McAuliffe, Palo Alto, CA, Elisabeth R. Gunther, Joshua R. Floum, Deborah A. Sivas, Heller Ehrman White & McAuliffe, San Francisco, CA, for Earth Island Institute, Marine Mammal Fund, David R. Brower.

William T. McGivern, Jr., Paul E. Locke, Asst. U.S. Atty., San Francisco, CA, Barry M. Hartman, Charles R. Shockey, James C. Kilbourne, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, for James A. Baker, III.

Charles R. Shockey, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, Martin Hochman, DOC–Nat'l Oceanic & Atmospheric Adm., Office of Gen. Counsel, Long Beach, CA, for Robert A. Mosbacher.

C. Hugh Friedman, Lorenz Alhadeff & Oggel, San Diego, CA, John A. Hodges, Wiley Rein & Fielding, Washington, DC, August J. Felando, Richard C. Atchison, American Tunaboat Assoc., San Diego, CA, David G. Burney, U.S. Tuna Ass'n, San Diego, CA, for American Tunaboat Ass'n., Joseph J. Medina, Manuel A. Silva.

### ORDER

THELTON E. HENDERSON, Chief Judge.

This matter came before the Court on January 3, 1994, on plaintiffs' Motion for Preliminary Injunction. Having carefully considered the written and oral arguments of counsel, and the record herein, we convert the motion into a motion for partial summary judgment,[1] which is granted in part, and denied in part, for the reasons set forth below.

### I. BACKGROUND

Over the course of this litigation, this Court has addressed numerous issues relating to the enforcement and meaning of the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. §§ 1361 et seq. The focal point of the instant dispute is one particular marine mammal: the northeastern offshore spotted dolphin. Plaintiffs contend that the Secretary of Commerce must, under the MMPA, prohibit the further killing of these dolphins in the course of commercial fishing for yellowfin tuna, given his recent ruling that their population levels are now "depleted." According to defendants, however, the MMPA does not require that the Secretary's finding of depletion be given this effect.

Congress enacted the MMPA in 1972 to protect dolphins and other marine mammals. In particular, Congress was concerned with the high dolphin mortality rates caused by the yellowfin tuna fishing industry in the eastern tropical Pacific Ocean ("ETP"). *Earth Island Institute v. Mosbacher,* 929 F.2d 1449 (9th Cir.1991). Because tuna tend to swim underneath dolphins, tuna fleets in the ETP typically set large "purse seine nets" on groups of dolphins. Although this effectively catches the tuna, it also maims or kills the dolphins who become entangled in the nets. Between 1959, when purse seine nets became widely used and 1972, millions of dolphins were killed by tuna fishermen in the ETP. *See* 58 Fed.Reg. 58285, 58288 (1993).

---

1. The instant dispute raises an issue of statutory construction that both sides agree presents a question of law for the court to decide. Thus, although plaintiffs filed this motion as a motion for preliminary injunction, there is no additional evidence that would be presented in later proceedings; the record is complete now, at least with respect to the northeastern offshore spotted dolphin. Accordingly, the Secretary requests that we consolidate the preliminary injunction hearing with a "trial on the merits" under Fed. R.Civ.P. 65(a). While we agree that it would be more efficient to resolve this matter in one dispositive proceeding, we conclude that it is more appropriate to convert this matter into a motion for partial summary judgment rather than to proceed under Fed.R.Civ.P. 65(a). Accordingly, we treat the motion as if it were filed under Fed.R.Civ.P. 56.

The MMPA addressed this problem by imposing a general moratorium on the killing or "taking" of all marine mammals, including dolphins. 16 U.S.C. § 1371; *American Tunaboat Ass'n v. Baldrige,* 738 F.2d 1013, 1014 (9th Cir.1984). The moratorium is subject to certain limited exceptions, one of which allows the Secretary of Commerce ("Secretary") to issue permits for the "incidental taking" of marine mammals during commercial fishing operations. 16 U.S.C. § 1371(a)(2). Congress added, however, that "it shall be the immediate goal" that the incidental kill rates in commercial fishing operations be reduced to "insignificant levels approaching zero." *Id.* In the case of purse seine fishing for yellowfin tuna, this goal shall be satisfied by "a continuation of the application of the best marine mammal safety techniques and equipment that are economically and technologically practicable." *Id.*

Pursuant to the commercial fishing exception, the Secretary issued the American Tunaboat Association ("ATA") a general permit which, *inter alia,* imposed a quota on the number of dolphins killed in the domestic yellowfin tuna fishery in the ETP. In 1984, Congress statutorily extended this permit, subject to certain additional conditions and quotas. 16 U.S.C. § 1374(b)(2). Thus, the ATA permit is now codified in the MMPA.

On November 1, 1993, the National Marine Fisheries Service ("NMFS") listed the northeastern offshore spotted dolphin as "depleted" in response to a 1991 petition filed by Environmental Solutions International, Greenpeace, and other organizations. 56 Fed.Reg. 65724 (1991); 58 Fed.Reg. 58285

(1993). "Depleted" is a term of art under the MMPA, and means that a species or population stock has fallen "below its optimum sustainable population ("OSP")." 16 U.S.C. § 1362(1)(A).[2] Under agency regulations, a species is considered to have fallen below its OSP—and is therefore "depleted"—if its population level is **less than 60 percent** of its estimated "historic" levels, before purse seine fishing became prevalent. 45 Fed.Reg. 72178 (1980); 58 Fed.Reg. 58285 (1993).

In the case of the northeastern offshore spotted dolphin, the Secretary found that its population has diminished 77 percent from its historic population level of over 3 million in the 1950s. Thus, the current stock level is estimated to be at only **23 percent** of its OSP—a figure "far below" the 60 percent standard for triggering a finding of "depletion." 58 Fed.Reg. 58290, 58295 (1993).

Plaintiffs argue that the Secretary is not permitted, under the terms of the ATA permit and the MMPA, to allow the ATA to continue killing dolphins that have been listed as depleted. Therefore, the Secretary must prohibit the ATA from continuing to set nets on, and kill, northeastern offshore spotted dolphins. Defendants, however, contend that such actions are permissible under the current ATA permit, and that the MMPA provisions relied on by plaintiffs are irrelevant to the instant dispute.[3]

Accordingly, plaintiffs filed the instant motion seeking an injunction against the further incidental taking of northeastern offshore spotted dolphin under the ATA permit.[4] In

---

**2.** OSP is defined as a range of population levels between maximum net productivity and carrying capacity—i.e. the historic marine mammal stock levels prior to extensive development of the tuna purse seine fishery (i.e. 1959). 16 U.S.C. § 1362(9).

**3.** The Secretary has also taken the position that no other steps, such as a "conservation plan," are needed to encourage the rebound of this severely depleted stock. A provision of the MMPA requires the NMFS to prepare a "conservation plan" for any species or stock designated as depleted, unless it determines that such a plan "will not promote the conservation of the species or stock." 16 U.S.C. § 1383b(b)(1)(C). In this case, the NMFS has concluded that such a plan is not necessary because "[i]nternational and

U.S. efforts to reduce dolphin mortality in the purse-seine fishery for tuna, and to promote dolphin conservation have been, or are being, implemented." 58 Fed.Reg. 58296 (1993).

**4.** Under the comparability standards developed pursuant to 16 U.S.C. § 1371(a)(2)(B), the Secretary agrees that any such relief would also affect foreign fleets, which in recent years have become the larger source of dolphin mortality in the ETP. *Earth Island Institute v. Mosbacher,* 746 F.Supp. 964, 967–68 (N.D.Cal.1990), *aff'd,* 929 F.2d 1449 (9th Cir.1991). This factor is particularly significant here because domestic fishermen are responsible for only a small fraction of the number of northeastern offshore spotted dolphins killed each year. Gerrodette Decl. at ¶ 5.

addition, plaintiffs request similar relief with respect to the western/southern stock of offshore spotted dolphins. While this stock is under continued study, it has not been listed by the Secretary as depleted. Nonetheless, plaintiffs urge us to extend relief to this stock as well, until and unless the NMFS issues a finding that it is *not* depleted because (1) the stock is potentially depleted, and (2) the setting of purse seine nets on western/southern offshore spotted dolphins may result in the killing of northeastern offshore spotted dolphins because the stock sometimes swim together and are difficult to differentiate.

Defendant-intervenor, the American Tunaboat Association, also participated in this motion, but did not address the primary arguments made by plaintiffs. Rather, it focuses on a separate issue: whether it is entitled to an administrative hearing to challenge the depletion listing before any action affecting its permit can be taken.

## II. *DISCUSSION*

Resolution of this motion requires us to address the following issues. First, whether the incidental killing of northeastern offshore spotted dolphins in the ETP must cease, now that the Secretary has listed this stock as depleted, and if so, whether the western/southern stock should also be afforded this same protection. Second, if either of the above questions are answered in the affirmative, we must resolve whether the ATA is entitled to an opportunity to administratively challenge the depletion listing before any action affecting its permit is taken. We address these issues in turn.

A. *Whether commercial tuna fishermen, operating under the ATA permit, are prohibited from killing northeastern offshore spotted dolphins, now that their population is depleted*

■ Under the MMPA, the Secretary normally issues a permit for commercial fishing operations after notice and hearing. In the case of the ATA permit, this process was protracted and complex, and often precipitated litigation. *See* H.R. No. 758, 98th Cong., 2nd Sess., 5, *reprinted in* 1984 U.S.C.C.A.N. 635, 638 ("1984 House Report"). Thus, once domestic dolphin mortality rates declined significantly, Congress decided that a more streamlined approach was merited. *Id.* at 4–5. Accordingly, in 1984, Congress bypassed the process for administratively renewing the ATA permit and instead statutorily extended the permit that had been issued to the ATA by the Secretary in 1980. At the same time, Congress added several additional restrictions. 16 U.S.C. § 1374(h)(2).

These 1984 amendments to the MMPA read, in pertinent part, as follows:

(A) Subject to subparagraph (B) [below], *the general permit issued under paragraph (1)*[5] *on December 1, 1980 to the American Tunaboat Association is extended* to authorize and *govern* the taking of marine mammals incidental to commercial purse seine fishing for yellowfin tuna during each year after December 31, 1984.

(B) The extension granted under subparagraph (A) is subject to the following conditions. . . .

(iii) *During the period of the extension, the terms and conditions of the general permit that are in effect on the date of the enactment of this paragraph shall apply, except that—*

(I) the Secretary may make such adjustments as may be appropriate to those terms and conditions that pertain to fishing gear and fishing practice requirements and to permit administration;

(II) *any such term and condition may be amended or terminated if the amendment or termination is based on the best scientific information available,* including that obtained under the monitoring program required under paragraph (3)(A); and

(III) during each year of the extension, not to exceed 250 coastal spotted dolphin (Stenella attenuata) and not to exceed 2,750 eastern spinner dolphin (Stenella lon-

---

5. Paragraph (1) provides as follows: "Consistent with the regulations prescribed pursuant to section 1373 of this title and to the requirements of section 1371 of this title, the Secretary may issue general permits for the taking of such marine mammals, together with regulations to cover the use of such general permits."

girostris) may be incidentally taken under the general permit, and no accidental taking of either species is authorized at any time when incidental taking of that species is permitted.

(C) The quota on the incidental taking of coastal spotted dolphin and eastern spinner dolphin under paragraph (2)(B)(iii)(III) shall be treated—

(i) as within, and not in addition to, the overall annual quota under the general permit on the incidental taking of marine mammals. . . .

16 U.S.C. § 1374(h)(2) (emphasis added). In 1992, Congress further restricted total dolphin mortalities under the ATA permit to 1,000 for the year January 1, 1992 and 800 for the period January 1, 1993 through March 1, 1994, and prohibited *any* setting of nets on eastern spinner or coastal spotted dolphins. 16 U.S.C. § 1416(a).

When the above provisions of section 1374(h)(2) are taken together with other provisions of the MMPA, the terms of the 1980 permit, prior agency constructions, and legislative history, there is no doubt that Congress did not intend to allow, under the ATA permit, the continued killing of dolphins that the Secretary has listed as depleted.

First, as quoted above, the 1984 amendments **expressly extend** the terms of the permit issued to the ATA by the Secretary in 1980, and **expressly** state that such terms shall "govern" and "apply," subject to certain additional conditions simultaneously added by Congress in 1984. Section 1374(h)(2)(A) provides that the 1980 permit is "extended to authorize and govern" further takings. Similarly, section 1374(h)(2)(B)(iii) clearly states that "[d]uring the period of the extension, the terms and conditions of the general permit that are in effect on the date of the enactment of this paragraph shall apply [except for certain specified conditions]." (emphasis added).

Second, it is equally clear that, under the 1980 ATA permit, the taking of depleted species was not allowed. As the parties agree, the 1980 permit was issued by the

Secretary pursuant to sections 1371(a)(2) and 1374. Section 1371(a)(2) authorized the Secretary to issue a permit to the ATA for commercial fishing under section 1374, which expressly requires that any such permit be "consistent with the requirements of § 1371." Section 1371, in turn, forbids the Secretary from issuing any permit for the taking of depleted species, except for purposes of scientific research:

> Except for scientific research purposes as provided for in paragraph (1) of this subsection, during the moratorium *no* permit may be issued for the taking of any marine mammal which has been designated by the Secretary as depleted, and no importation may be made of any such mammal.

16 U.S.C. § 1371(a)(3)(B) (emph. added). The 1980 ATA permit issued by the Secretary was necessarily subject to this explicit restriction. Defendants essentially concede as much when they admit that "[i]f this issue had arisen ten years ago [before the 1984 amendments] the defendants would agree that the Secretary could not then have issued a permit that authorized the ATA to take a depleted marine mammal." Defs' Oppo. at 15, n. 14.

The 1980 ATA permit itself confirms this point.[6] It explicitly states that "[t]his permit . . . [is] issued *under the authority of and shall be valid only for takings consistent with the terms and conditions set forth in 50 C.F.R. 216.24* and the terms of this permit." (emphasis added). Under part 216–216.24 of the Code of Federal Regulations, the Secretary has repeatedly stated that the MMPA does not permit the taking of depleted marine mammals, and has limited the ATA permit to preclude the taking of any dolphin stock or species found to be depleted.

Thus, in 1977, the final regulations governing the taking of marine mammals incidental to tuna purse seine fishing in the ETP stated:

> Section 101(a)(3)(B) [16 U.S.C. § 1371(a)(3)(B) ] of the [MMPA] requires that, except for purposes of scientific research, no permit may be issued during the moratorium for the taking of any stock

---

**6.** In response to a question by the Court, a copy of the permit was provided at oral argument by

plaintiff's counsel without objection by defendants.

or species of marine mammals designated as depleted.

42 Fed.Reg. 64548, 64549 (1977) (50 C.F.R. Pt. 216). Consistent with this, the 1977 ATA permit terms prohibited the encircling of eastern spinner dolphins in the course of purse seine fishing operations because the Secretary had listed this species as depleted. *Id.* at 64549, 64554 (50 C.F.R. Pt. 216.24)

Similarly, in February, 1980, the Secretary's proposed regulations amending the 1977 ATA permit reiterated that:

"A general overriding consideration is that, except for scientific research, the MMPA does not allow any incidental take permits to be issued if the subject species or population stock is designated as depleted."

45 Fed.Reg. 10552, 10553 (1980) (50 C.F.R. Pt. 216). The final regulations found that the eastern spinner and coastal spotted dolphin were depleted, and prohibited the encircling of this stock in the terms of the 1980 ATA permit. 45 Fed.Reg. 72179, 72189 (1980) (50 C.F.R. 216, 216.24).[7] The 1980 regulations also found that the northern offshore spotted dolphin was *not* depleted and therefore encircling of this stock was *not* prohibited. *Id.*

In short, the federal regulations referenced by the 1980 ATA permit, and which provide the authority for that permit, make it quite clear that the 1980 ATA general permit did not permit the taking of dolphins that belonged to a depleted species or stock. Indeed, defendants do not appear to seriously contest this point.

We further observe that the 1980 ATA permit ban on the taking of depleted dolphins is entirely consistent with Congressional intent. The unquestionable primary purpose of the MMPA is to prevent marine mammals from falling below their optimum sustainable population or OSP, and to replenish any depleted species. The introduction to the MMPA states that:

The Congress finds that—

(1) certain species and population stocks of marine mammals are, or may be, in danger of extinction or *depletion* as a result of man's activities;

(2) *[such mammals] should not be permitted to diminish below their optimum sustainable population. Further measures should be immediately taken to replenish any species or population stock which has already diminished below that population*

16 U.S.C. § 1361. *See also* 1984 House Report at 4–5, 1984 U.S.C.C.A.N. at 637. ("[The MMPA] was enacted in 1972 for the purpose of ensuring that marine mammals are maintained at healthy population levels.... Under the terms of the MMPA, the incidental take of animals from various porpoise stocks is allowed only if the given stock is determined to be at the [OSP] level"); 42 Fed.Reg. 72178 (1980) (50 C.F.R. Part 216) ("The [MMPA] was based on a concern that certain species of marine mammals were in danger of depletion and the belief that those animals should not be allowed to diminish below their optimum sustainable population"); 58 Fed.Reg. 58285 (1993) (reiterating that "Section 2 of the MMPA (13 U.S.C. § 1361) states that marine mammal species, populations and/or stocks should not be permitted to fall below their OSP levels"). Even defendants can not help but concede that "[t]he MMPA's overall goal is to keep marine mammal species from falling below OSP." Defs' Oppo. at 6.

The Ninth Circuit Court of Appeals also underscored this point when it summarized the central scheme of the MMPA in 1984:

The MMPA generally imposes a moratorium on intentional takings of porpoise species most often associated with yellowfin tuna. Recognizing, however, that certain of the species exist in abundance, the MMPA delegates to the Secretary of Commerce the duty to issue permits for the taking of these porpoise incidental to commercial fishing. The Secretary of Commerce, in turn, delegates to [the National Oceanic & Atmospheric Administration] the duty of determining which species of porpoise are 'disadvantaged' or 'depleted' within the meaning of the MMPA. *The basic approach of the statute and regula-*

---

7. The ATA subsequently challenged the depletion listing in court, and it was overturned by the Ninth Circuit in *American Tunaboat Ass'n v. Baldrige,* 738 F.2d 1013 (9th Cir.1984).

*tions has been to impose yearly quotas on the taking of abundant porpoise species by tuna fishermen, and to prohibit the taking of any species deemed depleted.*

*Baldrige,* 738 F.2d at 1014–15 (emphasis added); *see also Committee for Humane Legislation, Inc. v. Richardson,* 540 F.2d 1141, 1148 (D.C.Cir.1976) ("[The MMPA] was to be administered for the benefit of the protected species rather than for the benefit of commercial exploitation").[8]

Given all of the above, we readily find that the 1980 ATA permit prohibited the taking of depleted species in the ETP. This brings us back to the current ATA permit, which as described above, consists of an extension of this 1980 permit, "subject to" a number of additional conditions provided by Congress in 1984, 1988 and 1992. *See* 16 U.S.C. §§ 1374(h)(2), 1416(a). If any of these new permit terms contradicted, conflicted with, or otherwise modified the limitation on taking depleted species, that aspect of the 1980 ATA permit would, of course, yield to the new terms set by Congress. However, none of these additional conditions—all of which are designed to enhance the protection of dolphins—state that killing depleted species in the ETP is permissible. As such, the intent of Congress is clear. The Secretary may not, consistent with the MMPA, allow the ATA to continue killing northern offshore spotted dolphins, given their depleted status.

Defendants' arguments to the contrary fall into two general categories. The first concerns arguments that the provision regarding depleted species, section 1371(a)(3)(B), has no application to this case because it does not apply to commercial fishing permits issued under section 1371(a)(2). The second concerns the argument that Congress did not intend to limit the killing of any dolphin stock not specifically identified in the 1984 or subsequent amendments, even though such stock might be subsequently listed as depleted. As explained below, these arguments are at odds with both the language and in-

tent of the MMPA, and thus must be rejected. *Earth Island,* 929 F.2d at 1453 (rejecting agency position that is "at odds with both the language and the purpose of [the] MMPA").

### (1) Applicability of section 1371(a)(3)(B) to section 1371(a)(2)

As the above discussion demonstrates, the Secretary plainly believed that section 1372(a)(3)(B) applied to permits issued under sections 1374 and 1371(a)(2), when he issued the ATA its general permit in 1980. Indeed, defendants concede that the Secretary could not have authorized the ATA to take a depleted marine mammal in years prior to 1984. Defs' Oppo. at 15, n. 14. The only possible basis for this concession (and defendants provide no other), is the applicability of section 1371(a)(3)(B) to section 1371(a)(2).

Nonetheless, the Secretary now asserts for the first time that section 1371(a)(B)(3) does not apply to permits issued under sections 1371(a)(2) and 1374. He notes that (a)(2) makes no explicit reference to (a)(3)(B). We fail to find this significant, however, because (a)(2) expressly references section 1374(h), which in turn requires that any permit issued by the Secretary be consistent with the requirements of section 1371. The Secretary further observes that (a)(2) directly addresses the commercial fishing exception to the moratorium, while (a)(3)(B) is a more "general" provision. Therefore, we should not elevate the "general permit language" of (a)(3) over the "more specific language" of (a)(2). This argument, however, has little force. Since (a)(3)(B) applies to (a)(2), by way of section 1374(h)(1), it is not a matter of "elevating" (a)(3)(B) over (a)(2); rather, it is simply the case that (a)(2) and (a)(3)(B) apply together in this instance.

Furthermore, the Secretary's current position runs directly counter to the MMPA's primary purpose of preventing dolphins from falling below OSP. Protecting species that

---

**8.** In 1988, Congress amended the MMPA to allow the incidental take of small numbers of marine mammals from a depleted stock or species during the course of commercial fishing operations. 16 U.S.C. § 1383a. This amendment, however, does not apply to the ATA permit. *Id.*

at § 1383a(a)(2) ("The provisions of this section other than subsection (e)(6)(A) of this section shall not govern the incidental taking of marine mammals in the course of commercial yellowfin tuna fishing subject to section 1374(h)(2) of this title").

have already fallen well below OSP, and are depleted, is certainly significant to this scheme. Yet, defendants contend that section 1371(a)(3)(B), although admittedly a provision of general applicability, was only intended by Congress to apply to one minor circumstance: permits issued for purposes of "public display" under section 1371(a)(1). We find this marginalization of section 1371(a)(3)(B) difficult to square with the express purposes of the MMPA.

Finally, we observe that even were the Secretary to provide some reasoned basis for his current view of section 1371(a)(3)(B), such post hoc interpretation can not rewrite the meaning of the 1980 ATA permit. As discussed above, it was clear that the Secretary did not permit the taking of depleted species under the 1980 ATA permit, and it is this 1980 permit which Congress extended in 1984, and which forms the basis of the ATA permit presently in effect.

Accordingly, and for all the reasons set forth above, we reject the Secretary's contention that 16 U.S.C. § 1371(a)(3)(B) has no applicability to this case.

### (2) The 1984 Statutory Extension

Defendants alternatively contend that any limitation on taking depleted species, that might have been part of the 1980 ATA permit, was superseded once Congress statutorily extended the permit in 1984. As of 1984, defendants argue, the "basic terms" of permissible conduct were defined by sections 1374(h)(2), (3), and later, section 1416(a) as well. Because these provisions do not explic-

itly prohibit the incidental taking of species listed as depleted, defendants urge us to find that no such protection exists.

In essence, this argument requires us to conclude that Congress intended to retreat from the 1980 ATA permit restrictions regarding depleted dolphins when it statutorily amended it in 1984, 1988 and 1992. We find nothing, however, in the language of section 1374(h)(2) to support this view. As discussed above, Congress expressly stated that the terms of the 1980 ATA permit were **extended,** not replaced, and none of the specified additional conditions express any desire to weaken the limitations contained in the 1980 permit or retreat from Congressional goals as expressed in the MMPA. On the contrary, the additional conditions are designed to provide greater, not lesser, protections for dolphins in the ETP.[9]

Nor does the legislative history clearly support defendants' position. The 1984 House Report does state that difficulties in estimating current and historic stock sizes with a high degree of precision have precipitated lengthy and complex proceedings. 1984 House Report at 6. From this, defendants conclude that Congress was so dissatisfied with the process of determining OSP in 1984, that it intended to jettison this concept altogether.

Clearly, Congress believed that a quicker route to permit renewal was justified, given the declining dolphin take in the domestic yellowfin tuna fishery. *Id.* However, once the ATA permit is in place, the question whether a later determination that a particu-

---

**9.** To the extent that defendants argue that section 1374(h)(3)(B) implicitly superseded the protection for depleted species, we reject this argument. This section provides that if the Secretary finds that the incidental taking of a marine mammal is having a significant adverse effect on the stock the Secretary shall take such action as is necessary after notice and hearing to prevent any such adverse affect. Relying on this section, defendants contend that the *only* time the Secretary need act with respect to the ATA permit is if he makes a specific finding of significant adverse effect.

However, the plain terms of the ATA permit provide otherwise. The ATA permit is set forth in sections 1374(h)(2)(a), (b), and (c). Subsection (b)(iii)(I) provides that the Secretary may adjust terms of the permit that pertain to fishing

practice requirements, and (b)(iii)(II) provides that the Secretary may amend terms based on the best scientific information available. Neither provision makes *any* reference to section 1374(h)(3)(B) or otherwise requires the Secretary to make a special finding of significant adverse effect. Nor is section 1374(h)(3)(B) contained within section 1374(h)(2), which sets forth the terms and conditions of the ATA permit.

We do not, by this ruling, decide that section 1374(h)(3) has no application to section 1374(h)(2). By its placement, it may well have applicability to permits issued under both section 1374(h)(1) and (h)(2). Rather, we simply find that there is no support for defendants' assertion that section 1374(h)(3)(B) provides the exclusive avenue for the Secretary to act with respect to the ATA general permit.

---

lar stock was depleted should be given effect is another matter. At that point, Congress' concern regarding delays in issuance or renewal of the permit are no longer at stake. Nor does the legislative history express an intent that a finding of depletion, after the permit is issued, should not be given its usual effect. Indeed, Congress specifically authorized the Secretary to amend the ATA permit based on the best scientific information available. 16 U.S.C. § 1374(h)(2)(B)(iii)(II).[10]

As noted earlier, when Congress statutorily extended the ATA permit in 1984 it added conditions that were aimed at increasing protection for dolphins in the ETP. In 1988 and 1992, these protections were strengthened yet again. *See* 16 U.S.C. §§ 1374(h)(2)(B)(iv)–(ix), 1416(a). Thus, in all its actions affecting the ATA permit, Congress has each time added *more* protection for dolphins in the ETP. *See e.g. Earth Island Institute,* 929 F.2d at 1449 ("Congress amended the MMPA in 1988 to **enhance** protections for dolphins that were being killed in large numbers as a result of tuna fishing"). It would be incongruous to imply that Congress, at the same time, wanted to eliminate a longstanding protection for depleted dolphin species in the ETP.[11]

Finally, defendants argue that because Congress singled out the eastern spinner and coastal spotted dolphin for special quotas in 1984—and ultimately prohibited the use of any purse seine nets to encircle them in 1992—this constitutes a "deliberate choice" by Congress not to give any protection to the northeastern offshore spotted dolphin. While this argument may offer superficial appeal, it does not survive scrutiny.

At the time Congress imposed special quotas on the eastern spinner and coastal spotted dolphins in 1984, and later prohibited their capture altogether in 1992, neither stock was formally listed as depleted by the Secretary, although each stock was at least potentially depleted.[12] Nonetheless, they attracted the attention of Congress. As a result, Congress granted them special protection—protection they would not ordinarily be accorded under the MMPA because of their *non*-depleted status.

However, to presume from this fact that Congress specifically intended to preclude protection for a dolphin stock later listed as depleted, stretches credulity. Indeed, it would be most anomalous for Congress to protect a non-depleted stock, but not a stock that had suffered far greater population de-

**10.** Nor is there any indication that Congress intended to render all depletion determinations irrelevant simply because the available data may not always be complete or precise. Such is the nature of many determinations that agencies must make. Moreover, the MMPA contains a number of different provisions in which the depleted or non-depleted status of the species is relevant. Under defendants' view, all of these references would essentially be rendered meaningless.

**11.** In an August 1993 "Assessment on the Status of the Northeastern Stock of Offshore Spotted Dolphin," Phillips Decl., Exh. A, the NMFS concluded that this stock had been depleted as of 1988, and that the substantial fisheries kill between 1988 and 1990 "makes it unlikely that the population has experienced any significant recovery since then." *Id.* at 10–11. The report further notes that kill rates did decline significantly in 1991 and 1992. "**If** fisheries kill remains at [this] current lower level of less than 5,00 per year," the report further concludes, "the population **should eventually** increase and recover." *Id.* at 10 (emph. added). *See also,* 58 F.R. 58295. Passively waiting for such predicted eventualities to prove right or wrong, while a

severely depleted stock continues to be killed, hardly comports with Congress' desire that "[marine mammals] [] not be permitted to diminish below their optimum sustainable population," and that "measures should be immediately taken to replenish any species or population stock which has already diminished below [their OSP]." 16 U.S.C. § 1361.

We also note that the Secretary has repeatedly emphasized that the northeastern offshore spotted dolphin is not threatened with immediate extinction at this time, thus suggesting that Congress would therefore not be concerned with the depleted status of the northeastern offshore spotted dolphin. While a threat of extinction is clearly pertinent to inquiries under the Endangered Species Act, it has no relevance to the MMPA. As section 1361 plainly demonstrates, Congress intended that the protections afforded by the MMPA apply long before a species faces the threat of extinction.

**12.** Earlier proposed or final listings regarding these stocks had either been withdrawn by the Secretary or successfully challenged in court. Subsequent to the 1992 amendments, the Secretary again listed the eastern spinner dolphin as depleted. 58 Fed.Reg. 45066 (1993).

struction, and was, in fact, severely depleted. Indeed, defendants have pointed to no instance where Congress sanctioned the killing of a depleted stock in the ETP.[13]

"The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, n. 9, 104 S.Ct. 2778, 2781, n. 9, 81 L.Ed.2d 694 (1984). Thus, "where a statute is clear and unambiguous 'that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988).

In ascertaining the plain meaning of the statute, "the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp.*, 486 U.S. at 291, 108 S.Ct. at 1818; *Commonwealth of Massachusetts v. Lyng*, 893 F.2d 424, 429 (1st Cir.1990) ("in order to determine whether Congress had an actual intent regarding the [question at issue], we examine the statute's language, history, and purpose").

With respect to the instant dispute, the intent of Congress is clear. Employing traditional tools of statutory construction, we readily conclude that Congress did not intend, under the MMPA or the terms of the ATA permit, to permit the continued taking of dolphin species or stock in the ETP, once the Secretary has determined that their population level is depleted. The Secretary's arguments to the contrary are inconsistent with both the language and intent of the MMPA, and thus must be rejected. *Earth Island*, 929 F.2d at 1453.

■ Even if some ambiguity were present, our ruling would remain the same. Courts faced with a statutory ambiguity are generally obliged to uphold the implementing agency's interpretation, so long as it is based on a reasonable construction of the statute. *See e.g., Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782; *Wagner Seed Co., Inc. v. Bush*, 946 F.2d 918, 919 (D.C.Cir.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 1584, 118 L.Ed.2d 304 (1992); *Quinlivan v. Sullivan*, 916 F.2d 524, 526–27 (9th Cir.1990); This deference, however, is normally reserved for cases where the agency position is expressed in some regulation, rule or adjudicatory finding. Where the agency's view is simply offered to the court through the arguments of counsel in the context of litigation, deference is neither required nor warranted.

> We have never applied the principle of those [deference] cases to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice. To the contrary, we have declined to give deference to an agency counsel's interpretation of a statute where the agency itself has articulated no position on the question, on the ground that 'Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands.'

*Bowen v. Georgetown University Hospital*, 488 U.S. 204, 212, 109 S.Ct. 468, 473–4, 102 L.Ed.2d 493 (1988); *Bresgal v. Brock*, 843 F.2d 1163, 1168 (9th Cir.1987) ("[The agency] did not construe [the statutory provision at issue] until the onset of this litigation. The Secretary's construction is entitled to no more deference than is the interpretation of any party to the suit"); *see also* Robert A. Anthony, *Which Agency Interpretations Bind Citizens and the Courts?*, 7 YALE J. ON REG. 1, 60–61 (1990) (and cases cited therein).

■ As in *Bowen*, 488 U.S. 204, 109 S.Ct. 468, the Secretary's view of the current dispute is not grounded in regulations, rulings or administrative practice; it is reflected

---

**13.** Defendants point out that, at the time the 1992 amendments were passed, the Secretary had already issued a proposed ruling finding the northeastern offshore spotted dolphin depleted; yet, Congress still chose not to mention the northeastern offshore spotted dolphin in the 1992 amendments. However, because Congress

may well have assumed that the Secretary would take appropriate action if a depletion finding was finalized, it is difficult to infer that the failure to mention the northeastern offshore spotted dolphin in the 1992 amendments constituted an intent to deprive them of any protection.

only in arguments made in the context of this litigation. Indeed, certain aspects of the Secretary's position were only first articulated at oral argument. As such, the considerable deference ordinarily accorded an agency interpretation is not appropriate in this case. This is particularly so given that the Secretary has, without persuasive explanation, deviated from a longstanding interpretation of the interplay between section 1371(a)(3)(B) and section 1371(a)(2). *See Pauley v. Bethenergy Mines, Inc.,* 501 U.S. 680, 698, 111 S.Ct. 2524, 2535, 115 L.Ed.2d 604 (1991) ("As a general matter, of course, the case for judicial deference is less compelling with respect to agency positions that are inconsistent with previously held views"); *Bowen,* 488 U.S. at 212–13, 109 S.Ct. at 474.

For all of the reasons previously discussed, construing the ATA permit to preclude the taking of depleted species is far more consistent with the language of the MMPA, and Congressional intent, than the interpretation proffered by defendants. Thus, even assuming, *arguendo,* the existence of some ambiguity regarding the permissibility of taking depleted species under the ATA permit, we would conclude that such ambiguity should be resolved in plaintiffs' favor.

B. *Whether the western/southern offshore spotted dolphin is entitled to protection*

 Although the western/southern offshore spotted dolphin is under continued study, it has not yet been listed by the Secretary as depleted. Plaintiffs, however, seek a prohibition against the incidental taking of this stock as well, until and unless the NMFS issues a finding that it is *not* depleted because (1) the stock is potentially depleted, and (2) the setting of purse seine nets on western/southern offshore spotted dolphins may result in the killing of northeastern offshore spotted dolphins because the stock sometimes swim together and are difficult to differentiate.

We are not persuaded that the ATA permit or the MMPA requires a ban on the incidental taking of species or stock that are not listed as depleted by the Secretary. Thus, the fact that the western/southern offshore spotted dolphin may be potentially depleted, does not provide adequate legal grounds to support the relief requested. Accordingly, this aspect of plaintiffs' motion shall be denied.[14]

However, the record before the Court does indicate that northeastern and western/southern offshore spotted dolphins are closely related and have a similar outward appearance. *See e.g.,* Hall Decl. at ¶ 4. In addition, as both defendants' and plaintiffs' experts agree, "stock boundaries in the ocean environment are well-recognized as being fluid in time and space." Dizon Decl. at ¶ 4; Hall Decl. at ¶ 3. Thus, those northeastern offshore spotted dolphins that swim on the boundary between the northern and western/southern stocks are particularly vulnerable to further takings. Defendants have offered to propose ways to minimize the taking of northeastern offshore spotted dolphins in the boundary area, such as the use of buffer zones. Accordingly, and in order to fully effectuate the relief granted with respect to the northeastern offshore spotted dolphin, we shall require the parties to meet and confer regarding this matter.[15]

C. *Whether the ATA is entitled to an opportunity to administratively challenge the depletion listing before any action affecting its permit is taken.*

With respect to the northeastern offshore dolphin, plaintiffs essentially seek an order that (1) prohibits any further incidental taking of northeastern offshore spotted dolphins, and (2) requires the Secretary to issue a final rule in 30 days to this same effect. All parties agree that under the "comparability" provisions of the MMPA, such a rule would automatically apply to foreign fleets as well. The ATA argues that it is entitled to challenge the depletion listing in a hearing before the NMFS before there can be any change to the conditions of its permit. The

---

14. To the extent that plaintiffs dispute the NMFS' decision to (a) separate the offshore spotted dolphins into northeastern and western/southern stocks, and (b) not list the latter as depleted, such dispute falls outside the scope of this action.

15. The parties have also engaged in mediation in this action. If desired, they may seek to resolve this matter with the assistance of the mediator.

Secretary has expressed no opinion on this issue.

■ While the ATA would no doubt prefer to forestall the relief requested, we find that the ATA permit does not require further administrative process in this case for several reasons. First, as described above, in note 9, *supra*, section 1374(h)(2) contains two provisions which address changes to the ATA permit. Neither require an administrative hearing. In particular, section 1374(h)(2)(B)(iii)(II) allows the Secretary to amend the ATA permit based on the best scientific information available, without making any reference to a hearing:

> Any such term and condition of [the ATA permit] may be amended or terminated if [it] is based on the best scientific information available, including that obtained under the monitoring program required under paragraph (3)(A).

*See also* 1984 House Report at 9, 1984 U.S.C.C.A.N. at 642 ("[§ 1374(h)(2)(B)(iii)(II) ] allows the terms and conditions to be amended or terminated if the decision to do so is based on the best scientific information available"). Certainly, a depletion listing which is based on the best scientific evidence available, *see* 58 Fed.Reg. 58285, 58296 (1993), falls within the ambit of this section.

Second, the ATA has already had the opportunity to participate in the agency's decision to list the northeastern offshore spotted dolphin as depleted. There is nothing in the MMPA which suggests that once this process has been finalized, after input from affected parties, that those parties are then entitled to *another* hearing before the agency's final decision is given effect. If the ATA wishes to further challenge the agency's final decision to list the northeastern offshore spotted dolphin as depleted it may do so pursuant to the procedures set forth in 16 U.S.C.

§ 1374(d)(6); however, any such proceedings are not part of this action.[16]

■ Third, the ATA's contention, that it is entitled to an administrative hearing in this instance under either section 1374(e) or 1374(h)(3)(B), lacks merit. Section 1374(e) is the general provision that governs when the Secretary seeks to modify, suspend or revoke a permit issued by the Secretary. It entitles the permittee to notice and a hearing before the Secretary takes such action. However, section 1374(e) applies to instances where the Secretary initiates some regulatory action affecting a permit. Here, there is no Secretarial initiative. Rather, it is simply a matter of implementing statutory directives to which the permit is already subject, as determined by this Court.

■ The second provision relied on by the ATA, section 1374(h)(3)(B), provides, in part, that *"If the Secretary determines,* on the basis of the best scientific information available ... that the incidental taking of marine mammals is having a significant adverse effect on a ... stock, the Secretary shall take such action as is necessary after notice and [hearing] to modify [the quotas or requirements]."* (emph. added). Assuming, for purposes of this motion that section 1374(h)(3) applies, *see* note 9, *supra*, it is not triggered in this case. On its face, this section only provides for a hearing where the Secretary has made a finding of "significant adverse impact." Here, the Secretary is not proceeding under section 1374(h)(3)(B), and no such finding has been made with respect to this case. Accordingly, section 1374(h)(3) does not entitle ATA to a hearing in this instance.[17]

## III. CONCLUSION

For the reasons discussed above, it is HEREBY ORDERED that plaintiffs' motion for partial summary judgment is granted in

---

16. Notably, at oral argument, the Secretary agreed that, under the terms of the 1980 ATA general permit, a listing of depletion would authorize the Secretary to prohibit the further taking of the affected species or stock through notice to the permit holder, and that no hearing was required.

17. We note that the incidental taking of marine mammals may have a "significant adverse effect" on a species or stock without necessarily rendering the stock depleted. For example, incidental takings could be causing a stock to swiftly decline, which might be deemed a "significant adverse effect," although the stock is not yet depleted.

part, and denied in part, consistent with this Order. It is FURTHER ORDERED that:

1. Defendants are enjoined, effective immediately, from permitting the incidental taking of any northeastern offshore spotted dolphins in the ETP;

2. Defendant National Marine Fisheries Service shall issue final regulations, within forty days of the date of this Order, prohibiting the encirclement of any schools of dolphins where an official U.S. or Inter–American Tropical Tuna Commission ("IATTC") observer observes any northeastern offshore spotted dolphin in such school prior to the release of the net skiff, and incorporating such prohibition into the comparability standards developed pursuant to section 1371(a)(2)(B) of the Marine Mammal Protection Act. Defendant shall also convey such findings to affected foreign harvesting nations within this thirty-day period,

3. Intervenor-defendant American Tunaboat Association and its members are enjoined, pending issuance of such final regulations referred to in paragraph two, from allowing vessels operating under the ATA's general permit from encircling any school of dolphins where a U.S. or IATTC observer observes any northeastern spotted dolphin prior to release of the net skiff. After issuance of said final regulations, the ATA's general permit shall be subject to such regulations.

4. The parties shall meet and confer in good faith as soon as practicable, but no later than 7 days from the date of this order, for the purpose of devising means, such as a buffer zone, for minimizing the taking of northeastern spotted dolphins along the boundary between the northeastern and western/southern stock. In the event the parties are unable to resolve this matter informally, they shall notify the Court immediately and propose an alternative method for promptly resolving this issue.

5. The parties shall submit written status statements to the Court no later than 45 days from the date of this order. No appearance shall be required unless otherwise ordered by the Court.

IT IS SO ORDERED.