Howard L. BOERS, Donna M. Boers, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 96–509C.

United States Court of Federal Claims.

Sept. 30, 1997.

---

Donna M. Boers, pro se, argued for plaintiffs.

Janene M. Marasciullo, U.S. Dept. of Justice, Civil Division, Commercial Litigation Branch, argued for defendant. With her on briefs were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Sharon Y. Eubanks, Deputy Director.

## OPINION AND ORDER

BRUGGINK, Judge.

This is a case of first impression. Plaintiffs Howard and Donna Boers, appearing *pro se*, seek judicial review of a decision by the United States Department of Agriculture ("USDA") denying them benefits under the Dairy Indemnity Payment Program ("DIPP"), codified at 7 U.S.C. 450j. The matter is before the Court on cross-motions for summary judgment pursuant to RCFC 56.1. Our review is limited to the administrative record. For the reasons set forth below, plaintiffs' motion is granted in part and defendant's motion is denied.

### Facts Disclosed By The Administrative Record

The following facts are taken from the administrative record compiled by the USDA:

At various times in the 1940's, 50's and 60's, the USDA treated hundreds of thousands of acres of cotton-growing land in Arizona with DDT to control the Pink Bollworm. R. at 417. As the insects' resistance to DDT increased, so did the pesticide's application. *Id.* Eventually, use of DDT was banned by the State of Arizona (in 1969) and the Environmental Protection Agency (in 1971), *see* Notice to Manufacturers, Formulators, Distributors and Registrants of Economic Poisons, PR Notice 71–1 (Environmental Protection Agency, Jan. 15, 1971), but not before Arizona's soil had become contaminated. R. at 417. A continuing side effect of the Boll-worm eradication project is that fresh milk from certain areas in Arizona still contains detectable levels of the pesticide, and must be dumped when the concentration exceeds legal limits. *Id.* According to the State Dairy Supervisor, the legal limit in Arizona is 1.25 parts per million ("ppm"), and the Arizona Department of Agriculture keeps "all milk from reaching the food chain that exceeds the action level of 1.25 parts per million for DDT, DDE and DTE or any combination thereof." R. at 320. In addition, dairy farmers are routinely penalized by their milk handler, based on a formula, as the DDT in their cow's milk approaches the legal limit. R. at 417.

The Boers operated Mineso Dairy, a farm in Buckeye, Arizona. They were identified as Producer Number 472 by their milk handler, the United Dairymen of Arizona ("UDA"). The Boers maintained an account with the UDA that reflected the amount of milk they produced, as well as various costs, such as testing programs, hauling expenses for dumped milk, and pesticide penalties. *See, e.g.,* R. at 560–562.

To meet federal, state and local requirements, and to ensure sale of "milk of pure and wholesome quality," the UDA routinely tested milk produced by its members for a variety of contaminants, including DDE, a metabolite of the pesticide DDT. *See* R. at 573–76. The Arizona Department of Agriculture used UDA tests to screen the milk supply for contaminants, and required the industry to "withhold any product that is known to be contaminated." R. at 276. This mandate was implemented by a UDA policy requiring contaminated milk containing pesticide residue of 1.25 ppm or more to be removed from the market:

> PRODUCERS ARE REMINDED THAT MILK WHICH IS ABOVE THE LEVEL OF 1.25 PPM (BUTTERFAT BASIS) IN WHOLE MILK, WILL AUTOMATICALLY NOT BE MARKETED ... IF A PRODUCER IS OVER 1.25 PPM (BUTTERFAT BASIS) HIS MILK WILL EITHER BE DUMPED OR POWDERED

INTO AN ANIMAL FEED AT HIS DISCRETION.

R. at 573–74.

In January 1992, the Arizona Department of Agriculture, acting through the State Dairy Supervisor, Roy C. Collier, formally suspended the Boers' permit to produce Grade A raw milk for pasteurization. R. at 541–44. The reason for the suspension was that the Boers' milk exceeded the 1.25 ppm tolerance level for pesticide residue. *Id.* A UDA statement that month shows that the Boers' account was charged for hauling dumped loads of contaminated milk. R. at 538. Also, the UDA notified the Boers that samples taken on January 22, 26 and 30 were tested, found to be contaminated with DDE, and that some of the Boers' milk was dumped or sold for animal feed. R. at 488.

The Boers' permit was briefly reinstated on February 4, 1992. R. at 527. However, soon thereafter the State Dairy Supervisor issued additional notices during February that suspended the Boers' permit to produce milk, again because of pesticide residue. *See* R. at 478–79, 491–92, 495–96. A summary of UDA and state laboratory analyses shows that the Boers' milk repeatedly contained DDE contamination in excess of 1.25 ppm. R. at 486. In what appears to be an internal Arizona State Department of Agriculture memorandum, Roy C. Collier, State Dairy Supervisor, advised the Associate Director that "we are presently destroying approximately 15,000 pounds of milk every other day with regard to ... Boers–Mineso." R. at 494. A UDA statement for the month of February shows that Boers' account again was charged for hauling dumped loads of contaminated milk. R. at 472. Also, the UDA notified Boers that samples taken on February 1, 3, 11, and 27 were tested, found to be contaminated with DDE, and that some of the Boers' milk was dumped or sold for animal feed. R. at 468. Eventually, on March 2, 1992, Collier reinstated the Boers' permit, retroactively effective to February 29, 1992. R. at 474.

Although the State Dairy Supervisor did not suspend the Boers' permit again, their problems with DDE contamination continued. UDA laboratory tests of the Boers' milk revealed persistent DDE contamination in excess of 1.25 ppm during the month of October 1992. R. at 402–03. Both the October monthly statement and an invoice indicate that Boers' milk was dumped, at least some by the UDA. R. at 387, 400. Similarly, UDA laboratory tests throughout November 1992 showed persistent DDE contamination above the legal limit. R. at 381. Also, of two samples tested by the state laboratory, one was above the legal limit. R. at 371.

On November 17, 1992, Howard Boers filed two applications for indemnity payments under DIPP for dumped milk with the County Office of the Agricultural Stabilization and Conservation Service ("ASCS"), the division of USDA that administered DIPP.[1] R. at 374–5. One application sought reimbursement for contaminated milk produced and destroyed during the months of January and February 1992; the other for milk produced and destroyed in October 1992. *Id.* Mr. Boers filed an additional application on December 15, 1992, seeking reimbursement for tainted milk produced and destroyed in November 1992. R. at 338.

Mr. Boers indicated on each application that the milk contaminant in question was DDE, that he had not used DDE on his farm in the past 24 months, that he had not purchased cows recently which might have been contaminated, and that he had not purchased feed that might have caused the contamination. R. at 338, 374–75. To the question "Did you know or have reason to believe that the *contaminated feed contained a harmful substance?*" Mr. Boers cryptically responded "DDE Home grown/NA/Jan 92" on the applications covering the January–February period and the October period. R. at 374–75. On the application covering the November period, Mr. Boers responded "NA" to the same question. R. at 338.

On January 13, 1993, the County Office of ASCS requested additional documentation from the Boers in support of their application. R. at 306. Specifically, ASCS wanted payroll statements, production records, and loading invoices, all from UDA, as well as

---

1. As explained below, the DIPP program ended in 1995.

"letters stating milk is removed from market and letters of reinstatement of milk back to market for each application you submitted." *Id.* In addition, by a separate letter, the County Office of ASCS requested daily pick-up records from UDA. R. at 305.

On February 12, 1993, the Deputy Administrator authorized a payment of $4,424.74 for January–February 1992 period, conditioned on program requirements having been met. R. at 289–90. A week later, the County Office of ASCS mailed Mr. Boers a draft for $4,424.74 for the January–February period, but notified him that

> DASCO has also denied the October and November 1992 claims because you knowingly continued to feed the dairy cattle with feed raised on the DDE contaminated land.
>
> When you learned the land was contaminated and the feed produced on that land was the reason for the contamination of the milk you should have ceased feeding the contaminated feed.
>
> Also, the Arizona State Department of Agriculture did not officially remove the milk from the commercial market for October or November.

R. at 287–88. This rationale for denying DIPP benefits was subsequently confirmed by the Deputy Administrator of ASCS, (R. at 285–86), and the Boers appealed the ASCS decision to the National Appeals Division ("NAD") on March 3, 1993. R. at 271–75.

On December 14, 1993, the NAD notified the Boers that their appeal had been denied, and that this decision was a final administrative determination. R. at 180. The NAD's analysis focused on the contaminated cattle feed and the Boers' obligation to discontinue using such feed. R. at 182–83. Apparently, the Boers stated at the NAD hearing[2] that they had stopped using the contaminated feed immediately, but that their milk nonetheless continued to be contaminated with DDE, probably because DDE residue lingered in their cattle. R. at 183. The NAD discounted this explanation for the continuing contamination as follows:

Appellant furnished no information to substantiate his contention that there would be a continuing residual effect in the milk following a short period after withdrawal of the contaminated feed. Specifically, there is certainly no evidence to indicate even if there was a short term residual effect that such an effect would carry over to October or November 1992 as Appellant claims. It appears Appellant may have continued to feed the hay containing DDE to the cattle and contributed to further contamination of the milk.

*Id.*

Proceeding with its analysis, the NAD concluded:

At a minimum, after the hay was tested and found to contain DDE residues, Appellant did not establish that he did not know or have reason to know that milk produced in October or November 1992 was contaminated. Appellant's continuous testing of the contaminated milk shows he was aware that contamination of the herd was continuing. Further, there is no documentation that milk produced by Appellant's cattle in October or November 1992 was removed from the normal commercial market by a public regulatory agency. Appellant dumped milk based on tests performed at his own request by an independent laboratory before it was presented for sale or testing by the appropriate regulatory agency. Consequently, the criteria for qualifying for DIPP benefits in October and November 1992 were not satisfied.

*Id.*

On April 25, 1994, the NAD denied a request for reconsideration. In the same communication, the NAD also clarified that "we did not conclusively find that you continued to feed contaminated feed to the cattle ... nor was our determination based on such a conclusion." R. at 66. Instead, the NAD explained that it denied the Boers DIPP benefits because (1) the milk was not removed from the commercial market by a public regulatory agency, but rather by the

---

**2.** The record does not contain a transcript of the hearing, and as far as the court can tell, none was ever prepared.

Boers after they had laboratory tests performed at their own expense, and (2) the Boers knew or had reason to know that the milk continued to be contaminated. *Id.* These two justifications form the basis for our record review.

Discussion

This is a review of agency action.[3] The parties have cross-moved for summary judgment pursuant to RCFC 56.1. Under established principles of judicial review, this court will not disturb an agency's factual findings unless those findings are arbitrary or capricious. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 413–14, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971); *see* 5 U.S.C. § 706(2)(A). On the other hand, an agency's conclusions of law are reviewed *de novo. Stegall v. U.S.,* 19 Cl.Ct. 765, 770 (1990); *see* 5 U.S.C. § 706 ("the reviewing court shall decide all questions of law"). Another pertinent principle of judicial review is that the agency's decision must stand on its own—this court is not free to uphold an agency decision except on a basis advanced by the agency. *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).

The Dairy Indemnity Payment Program

Starting in 1964, Congress authorized the Secretary of Agriculture to indemnify dairy farmers for economic losses caused by chemicals that were approved for use by the federal government and which contaminated their milk. Economic Opportunity Act, Pub.L. No. 88–452, § 331 (1964)(codified as amended at 7 U.S.C. § 450j). The legislation was designed to provide relief to dairy farmers plagued by a problem "which is not of their making and for which the Federal Government must take full responsibility." S.Rep. No. 90–1363 (July 8, 1968), *reprinted in* 1968 U.S.C.C.A.N. 2392–94 (statement of Senator Montoya). The program was phased out in 1995. The statute applicable to the Boers reads as follows:

> The Secretary of Agriculture is authorized to make indemnity payments for milk or cows producing such milk at fair market value, to dairy farmers who have been directed … to remove their milk … from commercial markets because of residues of chemicals registered and approved for use by the Federal Government at the time of such use.

\*    \*    \*    \*    \*    .\*

> Any indemnity payment to any farmer shall continue until he has been reinstated and is again allowed to dispose of his milk on commercial markets.

7 U.S.C. § 450j.

Pursuant to this authorization, the Secretary of Agriculture promulgated regulations to implement the Dairy Indemnification Payment Program ("DIPP"). 7 C.F.R. §§ 760.1–760.9 (1992). To receive indemnity payments, an "affected farmer" had to complete an application and submit it, along with additional information, such as a "copy of the notice from, or other evidence of action by, the public agency which resulted in the removal of the affected farmer's whole milk from the commercial market." 7 C.F.R. §§ 760.6, 760.8. An "affected farmer" also had to establish that

(1) He did not know or have reason to believe that any feed which he purchased and which contaminated his milk contained a harmful residue of a pesticide, a chemical, or a toxic substance.

(2) None of the milk was produced by dairy cattle which he knew, or had reason to know *at the time he acquired them,* were contaminated with residues of pesticides, chemicals or toxic substances … [and]

(3) The contamination of his milk was not otherwise his fault.

7 C.F.R. § 760.7(b)(emphasis supplied). Finally, the "affected farmer" had to adopt recommended practices for eliminating residues of pesticides from his milk as soon as practicable following the discovery of the initial contamination. 7 C.F.R. § 760.7(c).

---

**3.** This court applies familiar Administrative Procedure Act ("APA") standards in reviewing agen- cy determinations. *S & G Excavating, Inc. v. U.S.,* 15 Cl.Ct. 157, 161 (1988).

Most of the important terms are defined in the regulations.[4] Thus, "affected farmer" is defined as "a person who produces whole milk which is removed from the commercial market ... pursuant to the direction of a public agency because of pesticide residues in such whole milk by tests made by a public agency *or under a testing program deemed adequate for the purpose by a public agency.*" 7 C.F.R. § 760.2. (emphasis supplied). "Public agency," in turn, is defined as "any Federal, State or local public regulatory agency." *Id.* "Removed from the commercial market" means "(1) produced and destroyed or fed to livestock, (2) produced and delivered to a handler who destroyed it or disposed of it as salvage, or (3) produced and otherwise diverted to other than the commercial market." *Id.* And "commercial market" means "the market to which the affected farmer normally delivers his whole milk and from which it was removed." *Id.*

In rejecting most of the Boers' claims to reimbursement under DIPP, the USDA offered two justifications as to why the Boers were ineligible.[5] First, the USDA found that no public agency directed the Boers to remove their milk from commercial markets, but that instead the Boers destroyed the milk at their own initiative. R. at 66, 183. Second, the USDA determined that the Boers knew or had reason to know that their milk continued to be contaminated. *Id.* The government urges that either or both of these justifications are valid and dispositive, and that this court should uphold the USDA's decision. For their part, the Boers contend that the USDA's decision was improper to the extent that 90% of the DIPP benefits they claimed were rejected.

■ As an initial matter, that the Boers "knew or had reason to know contamination

of the milk was continuing," (R. at 66), is no reason to deny them DIPP benefits. Neither the statute nor the regulations disqualify an applicant simply because he knew his milk was contaminated.[6] Absent some showing of fault, as specified in 7 C.F.R. § 760.7, a farmer's knowledge that his milk is contaminated is legally irrelevant to his eligibility for DIPP reimbursement. Here, no fault on the part of the Boers appears in the record or is even argued by the USDA. Accordingly, the USDA misapplied the law and, to the extent it relied on this rationale in denying DIPP benefits to the Boers, committed error.

■ Remaining for consideration is the USDA's alternative justification for denying DIPP payments to the Boers, namely that the Boers independently removed their milk from the market, without being directed to do so by a public agency. Noting the existence of a series of orders by the State Dairy Supervisor in January and February 1992 that suspended the Boers' milk permit, the government argues that since there were no corresponding orders in October and November 1992, no "public agency" "directed" the Boers to remove their milk from the commercial market. Instead, the government asserts the Boers unilaterally and voluntarily tested their milk and removed it from the market, and that therefore they are not entitled to compensation under DIPP.

The problem with the government's argument is that a "public agency" can "direct" the removal of milk from the market in several ways, only one of which is by issuing a formal suspension order. In this case, the evidence of record indicates that the UDA acted as an agent of the State of Arizona in testing and removing milk from the commercial market:

> the feed she purchased, and which ultimately contaminated her milk, contained pesticide residues. Even if the record supported a conclusion that the Boers knowingly purchased contaminated feed, which it does not, the USDA did not deny the Boers DIPP benefits on this basis. As mentioned previously, the court cannot uphold agency action except on the grounds advanced by the agency. *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).

---

**4.** Significantly, the term "directed" (and its variants) is not defined.

**5.** A potential third justification, namely that the Boers continued to feed their herd contaminated feed, was expressly disavowed by the USDA. R. at 66–67.

**6.** The provision cited by the government in support of this justification, 7 C.F.R. 760.7(b)(1), does not apply. That provision addresses whether a farmer knew or had reason to believe that

United Dairymen of Arizona maintain a laboratory that is very capable of testing for DDT/DDE pesticides. We cannot use their results for regulatory action, but we can—and do—use their results for screening purposes. United Dairymen share their results with us routinely. . . . Industry is required to withhold any product that is known to be contaminated. When industry does withhold product because of contamination, it is acting as our agent. Again, to ensure a safe and wholesome supply. . . . Please be advised that [it] is against all federal, state and local rules and regulations to allow a known contaminant to enter the food chain.

R. at 276 (letter dated March 2, 1993, from Collier to Boers).

In another letter, Collier informed the Boers as follows:

This is to confirm our telephone conversation of today . . . wherein we advised that this agency, the Arizona Department of Agriculture, Animal Services Division, DAIRY AND PRODUCTS CONTROL OFFICE, will keep all milk from reaching the food chain that exceeds the action level of 1.25 parts per million for DDT, DDE and DTE or any combination thereof.

R. at 320 (letter dated December 28, 1992, from Collier to Boers).

This is confirmed by the UDA's statement of its policy with respect to contaminated milk:

In a continuing effort to offer for sale milk of pure and wholesome quality which meets all standards established by health agencies and the Food and Drug Administration, United Dairymen of Arizona has established the following policy which deals specifically with pesticide residue in milk. *ROUTINE TESTING*

The milk of all members shall be tested at random a minimum of eight (8) times

per year. Those members whose milk tests above 1.10 ppb [sic] (butterfat basis) will be tested every month.

\* \* \* \* \* \*

PRODUCERS ARE REMINDED THAT MILK WHICH IS ABOVE THE LEVEL OF 1.25 PPM (BUTTERFAT BASIS) IN WHOLE MILK, WILL AUTOMATICALLY NOT BE MARKETED. . . . IF A PRODUCER IS OVER 1.25 PPM (BUTTERFAT BASIS) HIS MILK WILL EITHER BE DUMPED OR POWDERED INTO AN ANIMAL FEED AT HIS DISCRETION.

R. at 573–74 (United Dairymen of Arizona, Residue Policy, Effective November 1, 1989).

Finally, the Collier memo of February 5, 1992 reflects that the state took credit for the UDA's dumping of tainted milk during the period of suspension. *See* R. at 494 ("we are presently destroying approximately 15,000 pounds of milk every other day with regard to . . . Howard Boers").

Under these circumstances, a UDA decision to dump milk amounts to a "direction" by a "public agency" to remove milk from the market that is compensable under DIPP.[7]

In relying solely on the absence of formal suspension orders for the October and November 1992 period as a basis for rejecting the Boers' claims, and in ignoring the evidence that the UDA acted as an agent of the Arizona Department of Agriculture, the USDA acted arbitrarily and capriciously. *See S & G Excavating*, 15 Cl.Ct. at 161–62 ("An agency decision is arbitrary and capricious to the extent the agency . . . 'entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency. . . .' ")(*quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983)); *cf. Ameri-*

---

7. The court notes that the Collier letter of March 2, 1993, includes the following statements:

United Dairymen of Arizona maintain a laboratory that is very capable of testing for DDT/DDE pesticides. We cannot use their results for regulatory action, but we can—and do—use their results for screening purposes. United Dairymen share their results with us routinely.

R. at 276. Thus, although the Arizona Department of Agriculture does not rely on UDA laboratory work when taking formal regulatory action, such as suspension, it clearly does consider the UDA its agent when the UDA tests its members' milk.

*can Tunaboat Assoc. v. Baldrige,* 738 F.2d 1013, 1016 (9th Cir.1984)("[E]ven though an agency decision may have been supported by substantial evidence, where other evidence in the record detracts from that relied upon by the agency we may properly find that the agency rule was arbitrary and capricious").

The government's argument that the UDA is itself not a public agency as defined in the regulations is therefore beside the point. The State of Arizona clearly is a public agency. And since the record shows that the UDA routinely tested and removed milk from the market pursuant to the laws of Arizona and at the direction of the State Dairy Supervisor, there was a "direction" from a "public agency," when the Boers' milk was removed from the commercial market by the UDA. *See* R. at 371, 381, 387, 400, 402–03.

■ It is not clear from the record, however, how much of the milk at issue was dumped by the UDA. Some of the milk appears to have been dumped by the Boers themselves, albeit after testing by the UDA. The record is insufficient to determine the extent of UDA involvement in the Boers' own dumping of milk. Nor is the record sufficient, in the event the latter dumping should not be recompensed, to segregate the various amounts dumped by the UDA directly, and to assess a recovery for less than the total amount plaintiffs seek.

■ For these reasons, the USDA's decision to deny DIPP benefits to the Boers is VACATED and REMANDED. On remand, the USDA shall re-open and develop the record sufficiently to enable this court, if required, to independently review the USDA's decision and calculate an appropriate payment.[8] While this court may not impose upon the USDA specific procedural requirements not contained in the APA or the controlling statute or regulations, it may direct "an agency to take the steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision." *Pension Benefit Guaranty Corp. v. LTV Corp.,* 496 U.S. 633,

654, 110 S.Ct. 2668, 2680, 110 L.Ed.2d 579 (1990); *see* 28 U.S.C. § 1491(a)(2) ("In any case within its jurisdiction, the [court] shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just."). This is particularly appropriate here in view of the Boers' *pro se* status.

Accordingly, the court points out that, on remand, the following inquiries would appear to be relevant:

(1) how much milk the Boers' produced during January—February 1992, and October—December 1992;

(2) the relationship, arrangement or understanding between the UDA and the Arizona Department of Agriculture relating to the testing of milk and its removal from the commercial markets due to contamination;

(3) how the milk of UDA members was tested and removed from the market in daily practice;

(4) how the Boers' milk was tested and removed from the commercial market during January–February 1992 and October—December 1992;

(5) for each day during January—February 1992, and October—December 1992, how much of the Boers' milk was removed from the commercial market, whether voluntarily or at the direction of a public agency;

(6) the quantity of (5) above that was removed from the commercial market by or at the direction of the UDA, the Arizona Dept. of Agriculture, or their representatives; and

(7) based on (1)—(6) above, the amount of DIPP benefits the Boers are owed.

In light of the foregoing, the court has reconsidered its order of June 20, 1997, which denied the Boers' motion to enforce its subpoena against the UDA. Since at least part of the information the Boers seek to discover from the UDA is relevant in light of the remand, this Court's order of June 20, 1997, is modified as follows:

---

**8.** Although the DIPP program was not renewed beyond Sept. 30, 1995, the County Office of the ASCS performs numerous functions in addition to administering the DIPP program and presumably is capable of developing the record, consistent with this opinion.

The United Dairymen of Arizona is DIRECTED to produce to Mr. and Mrs. Boers, 4308 S. Perryville Road, Buckeye, AZ 85326, all documents in its possession, custody or control that (a) relate or refer to the Boers or Mineso Dairy (No. 472), and (b) pertain to the year 1992, within 45 days of the date of the date of this order.

Plaintiffs are ORDERED to provide the USDA official responsible for hearing their claims on remand with copies of all documents they received from the UDA or the Arizona Department of Agriculture that relate to the dumping of their milk during January—February 1992 and October—December 1992.

Finally, plaintiffs' motions of September 3, 8, 10, 16 and 25 are denied as moot.

The matter is REMANDED to the agency for prompt consideration consistent with this opinion. The agency will notify the Boers directly as to what procedures will be utilized on remand.[9] Government counsel will notify the court in writing of the agency's decision on remand.

---

9. The agency may utilize whatever procedures are appropriate and consistent with law, however, the court suggests that, in light of the Boers' *pro se* status, the record be reopened for materials, including witness statements, extant at the time of the original determination.