Howard L. BOERS, Donna
M. Boers, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 96–509C.

United States Court of Federal Claims.

Sept. 14, 1999.

Donna M. Boers, Arizona, pro se.

Janene M. Marasciullo, appeared for defendant with whom were Assistant Attorney General Frank W. Hunger, Director David M. Cohen, and Assistant Director Bryant G. Snee, United States Department of Justice, Washington, D.C.

OPINION

BRUGGINK, Judge.

This action is once again before the court after remand to the United States Department of Agriculture (USDA). In an earlier decision, *Boers v. United States*, 39 Fed.Cl. 25 (1997), the court reversed a denial by

the USDA of benefits to plaintiffs, Howard and Donna Boers, pursuant to the Dairy Indemnity Payment Program (DIPP). 7 U.S.C. § 450j (1994). DIPP authorized the Secretary of Agriculture to indemnify dairy farmers for economic losses resulting from disposal of milk contaminated by federally approved chemicals. The remand order directed the agency to supplement the administrative record with materials necessary to properly calculate plaintiffs' indemnity payments. The USDA subsequently recalculated plaintiffs' benefits in light of the remand order, and awarded $31,872.09 in DIPP payments, but it then applied as a setoff against that payment the Boers' outstanding Farmers Home Administration (FmHA) loans. Because the amount of overdue loans was far in excess of $31,872.09, the agency concluded that the Boers were entitled to no affirmative recovery.

The matter is before the court on cross-motions for summary judgment pursuant to RCFC 56.1. Plaintiffs appear *pro se.* They contend that the USDA miscalculated their DIPP benefits and illegally applied their FmHA loan balance as an administrative offset against those benefits. Plaintiffs also seek interest pursuant to the Prompt Payment Act, 31 U.S.C. §§ 3902(a) *et seq.* (1994), and attorney fees and costs under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412 (1994). In its motion, defendant requests that we set aside the remand order, or, alternatively, affirm the USDA's remand decision.

Oral argument was held on August 13 1999. At the conclusion of oral argument, the court granted leave to defendant to file an answer asserting the administrative setoff as a counterclaim. An answer to the counterclaim is deemed unnecessary in view of the briefing on summary judgment. For the reasons set forth below, defendant's motion is granted with respect to affirmance of the benefit calculation. Plaintiffs' motion is denied.

## BACKGROUND

The Boers operated Mineso Dairy, a farm in Buckeye, Arizona. The farm was identified as Producer Number 472 by their milk handler, the United Dairymen of Arizona (UDA). The Boers maintained an account with the UDA that reflected the amount of milk they produced, as well as various costs, such as testing programs, hauling expenses for dumped milk, and pesticide penalties.

To meet federal, state and local requirements, and to ensure sale of "milk of pure and wholesome quality," the UDA routinely tested milk produced by its members for a variety of contaminants, including DDE, a metabolite of the pesticide DDT. Administrative Record (R.) at 573–76. The Arizona Department of Agriculture used UDA tests to screen the milk supply for contaminants, and required the industry to "withhold any product that is known to be contaminated." R. at 276. This mandate was implemented by a UDA policy requiring contaminated milk containing pesticide residue of 1.25 ppm or more to be removed from the market:

PRODUCERS ARE REMINDED THAT MILK WHICH IS ABOVE THE LEVEL OF 1.25 PPM (BUTTERFAT BASIS) IN WHOLE MILK, WILL AUTOMATICALLY NOT BE MARKETED ... IF A PRODUCER IS OVER 1.25 PPM (BUTTERFAT BASIS) HIS MILK WILL EITHER BE DUMPED OR POWDERED INTO AN ANIMAL FEED AT HIS DISCRETION.

R. at 573–74.

In January 1992, the Arizona Department of Agriculture, acting through the State Dairy Supervisor, Roy C. Collier, formally suspended the Boers' permit to produce Grade A raw milk for pasteurization. The reason for the suspension was that the Boers' milk exceeded the 1.25 ppm tolerance level for pesticide residue. A UDA monthly payment statement shows that the Boers' account was charged for hauling dumped loads of contaminated milk. Also, the UDA notified the Boers that samples taken on January 22, 26 and 30 were tested, found to be contaminated with DDE, and that some of the Boers' milk was dumped or sold for animal feed. Although a statement prepared by the Boers entitled "D.D.E. COST AND PENALTY FOR MINESO DAIRY H.L. BOERS"(DDE Statement) indicates that on January 31, 1992, 14,731 pounds from Load

Number 80722 were dumped, UDA transportation invoice for Load Number 80722, dated January 30, 1999, indicates that 14,713 [1] pounds of milk were sold to Triple T Dairy (TTT) for animal feed.

The Boers' permit was briefly reinstated on February 4, 1992. However, soon thereafter the State Dairy Supervisor issued additional notices during February suspending the Boers' permit to produce milk, again because of pesticide residue. A summary of UDA and state laboratory analyses shows that the Boers' milk repeatedly contained DDE contamination in excess of 1.25 ppm during the month of February. In what appears to be an internal Arizona State Department of Agriculture memorandum, Roy C. Collier, State Dairy Supervisor, advised the Associate Director that "we are presently destroying approximately 15,000 pounds of milk every other day with regard to ... Boers–Mineso." R. at 494. A UDA payment statement for the month of February shows that Boers' account again was charged for hauling dumped loads of contaminated milk. Also, the UDA notified Boers that samples taken on February 1, 3, 11, and 27 were tested, found to be contaminated with DDE, and that some of the Boers' milk was either dumped or sold for animal feed. The DDE Statement indicates that a total of 29,575 pounds of milk were dumped for the month of February. UDA transportation invoices dated February 11 and 28, 1992, however, show that all of this milk was sold to TTT for which the Boers' received $2,060. Eventually, on March 2, 1992, Collier reinstated the Boers' permit effective to February 29, 1992.

Although the State Dairy Supervisor did not suspend the Boers' permit again, their problems with DDE contamination continued. A document entitled "MINESO DAIRY LOG MILK DUMPED FOR PEST. RESIDUE," apparently prepared by the Boers, shows that a total of 45,417 pounds of milk were dumped during the month of March. The record does not indicate whether this milk was either tested and/or dumped at the direction of the UDA or voluntarily by the Boers. There is also no indication in the record that the Boers received any payment for the sale of this milk as animal feed. The DDE statement, however, does indicate that on March 31, 1992, the Boers were charged for "Outside Lab Testing." R. at 562.

UDA laboratory tests of the Boers' milk revealed persistent DDE contamination in excess of 1.25 ppm during the month of October 1992. The DDE statement indicates that a total of 77,458 pounds of milk were dumped during the period from October 8 through October 31, 1992. This document also shows that 7885 pounds of this milk were sold to San Juan Cattle Feeders (San Juan) for $2,365.50. A log prepared by the Boers for the month of October shows that an additional 16,203 pounds of milk were dumped beginning October 18 and ending October 31.

UDA laboratory tests throughout November also showed persistent DDE contamination above the legal limit. UDA test results for December, however, indicate DDE amounts at acceptable levels. Logs prepared for these months show that 106,941 and 74,992 pounds of milk were dumped during November and December. UDA monthly payment statements for these months do not indicate that any milk was dumped or sold as feed.

On November 17, 1992, the Boers filed two applications for indemnity payments under DIPP for dumped milk with the County Office of the Agricultural Stabilization and Conservation Service (ASCS), the division of USDA that administered the DIPP program. One application sought reimbursement for contaminated milk produced and destroyed during the months of January and February 1992; the other for milk produced and destroyed in October 1992. The Boers filed an additional application on December 15, 1992, seeking reimbursement for tainted milk produced and destroyed in November 1992.

On February 12, 1993, the Deputy Administrator authorized a payment of $4,424.74 for January–February 1992 period, conditioned on program requirements having been met.

---

1. It appears that the number of pounds of milk for Load Number 80722 was improperly recorded on this document and should read "14731" pounds.

A week later, the County Office of ASCS mailed the Boers a draft for $4,424.74 for the January–February period, but notified him that:

DASCO has also denied the October and November 1992 claims because you knowingly continued to feed the dairy cattle with feed raised on the DDE contaminated land.

When you learned the land was contaminated and the feed produced on that land was the reason for the contamination of the milk you should have ceased feeding the contaminated feed.

Also, the Arizona State Department of Agriculture did not officially remove the milk from the commercial market for October or November.

R. at 287–88. This rationale for denying DIPP benefits was subsequently confirmed by the Deputy Administrator of ASCS, and the Boers appealed the ASCS decision to the National Appeals Division (NAD) on March 3, 1993.

On December 14, 1993, the NAD notified the Boers that their appeal had been denied. The NAD concluded that the Boers did not establish that he did not know or have reason to know that milk produced in October or November 1992 was contaminated. It found that the Boers' continuous testing of the contaminated milk was evidence that he was aware that contamination of the herd was continuing. The NAD also concluded that there was no documentation in the record that the milk produced in October or November 1992 was removed from the normal commercial market by a public regulatory agency.

On April 25, 1994, the NAD denied a request for reconsideration. In the same communication, the NAD also clarified that "we did not conclusively find that you continued to feed contaminated feed to the cattle ... nor was our determination based on such a conclusion." R. at 66. Instead, the NAD explained that it denied the Boers DIPP benefits because: (1) the milk was not removed from the commercial market by a public regulatory agency, but rather by the Boers after they had laboratory tests performed at their own expense; and (2) the Boers knew or had reason to know that the milk continued to be contaminated. Plaintiffs subsequently filed a complaint in the United States District Court for the District of Arizona seeking judicial review of the USDA's decision. Finding that it lacked jurisdiction, that court transferred the case here on August 15, 1996.

On February 9, 1996, the Farm Service Agency (FSA)[2] wrote the Boers that it was accelerating plaintiffs' FmHA loans and declared the loans due immediately. Following receipt of this notice, the Boers did not pay the amount due on the loans or submit a repayment plan to the FSA.

The FSA wrote the Boers on August 21, 1997, stating that it intended to use future payments plaintiffs received through any federal program to offset monies owed on the FmHA loans pursuant to the Debt Collection Improvement Act of 1996 (DCIA), 31 U.S.C. § 3716 (1994). According to that letter, the Boers owed more than $500,000. The Boers appealed the FSA's decision to offset their debts to the NAD.

On September 30, 1997, we vacated and remanded the agency's decision denying plaintiffs' DIPP benefit applications. *Boers,* 39 Fed.Cl. at 32–33. We held that the agency erred in treating the question of knowledge of contamination as relevant to the issue of entitlement:

Absent some showing of fault, as specified in 7 C.F.R. § 760.7, a farmer's knowledge that his milk is contaminated is legally irrelevant to his eligibility for DIPP reimbursement. Here, no fault on the part of the Boers appears in the record or is even argued by the USDA. Accordingly, the USDA misapplied the law and, to the extent it relied on this rationale in denying

---

2. The Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994, Pub.L. No. 103–354, 108 Stat. 3178, (codified at 7 U.S.C. §§ 6901–7014 (1994)), inter alia, reorganized the ASCS into a new agency, the Farm Service Agency, which also includes the former Farmer's Home Administration. 7 U.S.C. § 6932 (1994).

DIPP benefits to the Boers, committed error.

*Id.* at 30.

With respect to the USDA's denial of plaintiffs' applications based solely on the absence of formal suspension orders for those periods, we held that the USDA acted arbitrarily and capriciously by ignoring evidence that the UDA acted as an agent of the Arizona Department of Agriculture when the Boers' milk was removed from the commercial market by the UDA. *Id.* at 31–32.

We found that the record was then insufficient to calculate an appropriate payment. We thus remanded to the USDA to reopen the record and determine: (1) how much milk the Boers produced during January—February 1992, and October—December 1992;[3] (2) the relationship between the UDA and the Arizona Department of Agriculture; (3) how milk in general was tested and removed from the market; (4) specifically, how the Boers' milk was tested and removed from the commercial market; (5) how much of the Boers' milk was removed from the commercial market, whether it was removed voluntarily or at the direction of a public agency; (6) the quantity of milk removed from the commercial market by or at the direction of the UDA, the Arizona Department of Agriculture, or their representatives; and (7) based on (1)—(6) above, the amount of DIPP benefits the Boers are owed.

On remand, the agency allowed plaintiffs to submit additional evidence and supplemented the record itself with additional information received from the UDA and the ADA. On May 5, 1998, the agency issued a decision granting plaintiffs $31,872.09 in DIPP benefits, representing milk destroyed during January, February, March, October, November, and December, 1992.

The remand decision indicates that the agency was unable to determine in all instances whether milk was removed from the commercial market voluntarily or at the direction of either the UDA or the Arizona Department of Agriculture. Consequently, unlike its normal practice, if any evidence existed that milk was dumped during a particular month in 1992, the agency granted compensation. In addition, the agency abandoned its normal practice of requiring a DIPP application, and permitted recovery for March and December; months for which the Boers had not submitted a payment application.

The agency determined the amount owed to plaintiffs by first calculating the market price per pound of milk for a particular month. It did this by dividing the total dollar amount the Boers received from the UDA by the number of pounds marketed as demonstrated on UDA monthly payment statements. This figure was then multiplied by the number of pounds of dumped milk for the corresponding month. The agency also deducted monthly Commodity Credit Corporation (CCC)[4] assessments totaling $493.00. From the sum total of all of the monthly DIPP benefits, the agency deducted $7,094.00 in payments the Boers received from the sale of the contaminated milk for use in the production of animal feed. The agency also deducted $4,424.74 previously paid to the Boers as a result of the agency's February 12, 1993 decision. The following chart reflects the agency's benefit calculation.

| 1992 mon. | Payment received $ | Milk Marketed lbs | Price per lb Marketed $/lbs | Dumped Milk lbs | DIPP Benefit $ |
|---|---|---|---|---|---|
| Jan | $26,307.43 | 219,733 | .11973 | 29,444 | $3,525.33 |
| Feb | $22,034.19 | 193,793 | .11370 | 29,575 | $3,362.68 |
| Mar | $20,869.30 | 188,455 | .11074 | 45,417 | $5,029.48 |

**3.** The record contains evidence that milk was dumped during these months.

**4.** The CCC is a government corporation created to finance federal farm programs with monies appropriated by Congress. The day-to-day operations of the CCC are performed by local chapters of the Farm Service Agency (FSA), formerly known as the Agricultural Stabilization and Conservation Service (ASCS). *See* 15 U.S.C. § 714c (1994).

| 1992 mon. | Payment received $ | Milk Marketed lbs | Price per lb Marketed $/lbs | Dumped Milk lbs | DIPP Benefit $ |
|---|---|---|---|---|---|
| Oct | $9,044.56 | 76,522 | .11820 | 93,661 | $11,070.73 |
| Nov | $9.539.29 | 82,158 | .11611 | 106,941 | $12,416.92 |
| Dec | $10,679.26 | 94,449 | .11307 | 74,992 | $8,479.35 |

|  |  |
|---|---|
| Total 1992 DIPP Benefits | $43,884.49 |
| CCC Assessments | <$493.66> |
| Amount Received for Sale of Milk as Feed | <$7,094.00> |
| Amount of DIPP Benefits Previously Paid to Boers | <$4,424.74> |
| Amount Owed to Boers | $31,872.09 |

On May 5, 1998, the FSA wrote to inform the Boers of its decision with respect to their indemnity payment. The agency concluded the letter by advising the Boers that the net benefits of $31,872.09 "will be offset" against debts owed on outstanding FmHA loans.

On August 11, 1998, the NAD affirmed the FSA's August 27, 1997 decision to offset monies owed on the Boers' FmHA loans. The NAD found that the Boers at that time were delinquent on FmHA loans totaling over $500,000. Although the FSA had yet to offset any payments, the NAD held that the FSA's decision to seek an offset was authorized pursuant to the DCIA. The Boers sought review of this decision by the NAD Director. On September 23, 1998, NAD Assistant Director, Laura D. McFarland, upheld the FSA offset. That decision has not been challenged in district court, see 7 U.S.C. § 6999, and thus is treated as final here.

Defendant filed the administrative record on September 25, 1998, along with the agency's final remand decision. The current cross-motions for summary judgment followed.

The court could not discern in plaintiffs' motion for summary judgment any clear challenge to the agency's determination of how much milk was dumped or the market price used to determine their benefits. Instead, a substantial portion of their moving brief is devoted to re-arguing the agency's 1993 findings and to questioning the completeness of the record, issues which the court declines to reconsider. They also argue that: the agency illegally applied an administrative offset; they are due interest pursuant to the Prompt Payment Act; and they are entitled to fees and costs under the EAJA.

In its cross-motion, the government asks the court to reconsider the September 30, 1997 opinion and order. Defendant argues that in order to comply with the court's order, the agency was forced to develop a unique procedure not contemplated by the applicable regulations, in order to calculate the DIPP benefits owed to the Boers. In the alternative, should we decide not to reconsider our previous ruling, defendant argues that the agency's remand decision should be affirmed as a proper calculation of DIPP benefits and set-offs pursuant to the Debt Collection Act, 31 U.S.C. §§ 3711(e), 3716(a).

In their response brief, plaintiffs for the first time challenge the agency's DIPP benefit calculation as unreliable. They assert that the agency improperly did not include DIPP benefits for the months of April, May, June, July, August, and September of 1992, and for January through March of 1993. Attached to their response, plaintiffs include DIPP applications for these months as well as revised applications for January, February, March, October, November, and December of 1992. During oral argument, however, plaintiffs gave up this aspect of their claim. In any event the court cannot consider the most recent DIPP applications, as they are clearly untimely and not part of this suit.

## DISCUSSION

### The Remand Order

We address first defendant's request for reconsideration of our September 30, 1997 opinion and order. Defendant argues that the court in effect required the agency to include milk dumped voluntarily in its DIPP benefit calculation and thereby exceeded its authority by imposing upon the USDA procedural requirements not contained in the APA or in the controlling statute or regulations. Defendant's premise is incorrect.

We held previously that the agency erred in relying solely on the absence of formal suspension orders for the months of October and November 1992 as a basis for concluding that the milk was dumped voluntarily. There was substantial evidence in the record that the UDA acted as an agent of the Arizona Department of Agriculture in its decision to remove milk from the market. The court held that the UDA's decision to dump milk amounted to a "direction" by a "public agency" to remove milk from the market that is compensable under DIPP. *Boers,* 39 Fed. Cl. at 31. The record, however, as it existed at the time was insufficient to determine precisely how much milk was dumped at the direction of the UDA or Arizona Department of Agriculture and how much milk was dumped by the Boers voluntarily.

On remand, therefore, we instructed the USDA to re-open the record and make that determination itself. Such an instruction is well within our authority. *Pension Benefit Guaranty Corp. v. LTV Corp.,* 496 U.S. 633, 654, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) (the court may direct "an agency to take the steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision"); *see* 28 U.S.C. § 1491(a)(2) ("In any case within its jurisdiction, the [court] shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just."). Contrary to defendant's suggestion, we did not instruct the agency to award DIPP benefits to the Boers for milk removed from the market voluntarily. The agency simply decided to give plaintiffs the benefit of the doubt when the evidence became equivocal. It had the right to do that.

Nor, as counsel suggested at oral argument, did we instruct the agency to ignore any regulatory criteria for calculating volumes of milk or milk prices. Indeed these administrative difficulties and choices were not made the subject of a motion for reconsideration and were only brought to the court's attention a year and a half after the remand order. The agency elected to be flexible in making those determinations and the court sees no reason to second-guess that

choice, particularly in view of the fact that plaintiffs appear *pro se.* Defendant's request to set aside our September 30, 1997, Order and affirm the agency's original decision is thus denied.

*The Benefit Calculation*

■ As to the substance of the remand decision, we review the agency's factual findings under the arbitrary and capricious standard, and review the agency's conclusions for compliance with the law. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 413–14, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); 5 U.S.C. § 706(2)(A) (1994). This court is not empowered to substitute its judgment for that of the agency. *Overton Park,* 401 U.S. at 416, 91 S.Ct. 814. We have reviewed the agency's benefit calculation under this standard and conclude that it is neither arbitrary, capricious, nor in violation of law.

Upon remand, the agency re-opened the record to allow plaintiffs to submit additional evidence. The agency also supplemented the record with additional information it sought and received from the UDA and the ADA. In sum, over 550 pages of documents were added to the record, a substantial portion of which were supplied by plaintiffs. Even considering this additional evidence, however, the agency concluded that it was unable to determine the amount of milk plaintiffs were directed to remove from the market versus how much milk the Boers dumped voluntarily. As an alternative, the agency chose to calculate plaintiffs' indemnity benefit based solely upon the total amount of contaminated milk removed from the market during 1992, regardless of who directed its removal or whether plaintiffs filed a DIPP application for a particular month.

The agency then determined plaintiffs' DIPP benefit by multiplying the number of pounds of dumped milk by the market price per pound. In calculating the amount of dumped milk, the agency relied on UDA monthly payment statements, UDA transportation invoices, the Boers' DDE Statement, and monthly logs submitted by the Boers. Where these documents showed conflicting amounts of dumped milk, the agency resolved such conflicts in favor of plaintiffs.

For example, the DDE Statement, prepared by the Boers, indicates that on January 31, 1992, 14,731 pounds of milk from Load Number 80722 were dumped. UDA transportation invoice for Load Number 80722, dated January 30, 1999, indicates that 14,713 pounds of milk were sold to TTT for animal feed. Although it would appear that these two documents are referencing the same milk, the agency included both amounts in determining that 29,444 pound of milk were dumped for the month of January. In addition, for the month of October 1992, the Boers' DDE statement indicates that a total of 77,458 pounds of milk were dumped during the period from October 8 through October 31, 1992. A log prepared by the Boers for the month of October shows that 16,203 pounds of milk were dumped beginning October 18 and ending October 31. Here again, although it would appear that there might exist some overlap between the two figures, the agency included both amounts in its overall tally of dumped milk for the month of October.

With respect to the market price per pound, the agency relied on the UDA monthly payment records. From these records, the agency calculated the market price per pound by dividing the total dollar amount the Boers received from the UDA for a particular month.

In short, the agency gave every benefit of the doubt to the Boers. Plaintiffs thus have no basis for complaint about the remand decision. In any event, they certainly have not provided any clear challenge to it. The documents attached to plaintiffs' numerous filings are, at best, perplexing. They appear to reference monthly marketing prices and monthly milk production, but no real explanation is provided for why the government's calculations are wrong, nor are sources for plaintiffs' figures included. We thus find that the agency's DIPP calculation on remand was not arbitrary or capricious and was in accordance with law.

*Interest*

■ The government is not liable for pre-judgment interest absent a contractual obligation or a legislative mandate. *See* 28 U.S.C. § 2516; *Library of Congress v. Shaw,* 478 U.S. 310, 316, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986). Plaintiffs' interest claim is based on the Prompt Payment Act, 31 U.S.C. § 3902(a) *et seq.* (1994). That act mandates that, if an agency acquiring property or services from a business does not pay the business on time for each completed or delivered item of property or service, interest is due. *Id.* The act thus does not apply here as the agency was not acquiring goods or services from plaintiffs. *See New York Guardian Mortgagee Corp. v. United States,* 916 F.2d 1558, 1560 (Fed.Cir.1990)(holding that the Prompt Payment Act applies only to the acquisition of goods and services by government agencies). Plaintiffs have not identified, nor has the court found, any other applicable regulatory or statutory basis for the award of interest.

*Attorney Fees, Costs, and Expenses*

Plaintiffs have requested an award pursuant to the Equal Access to Justice Act EAJA, 28 U.S.C. § 2412 (1994).[5] A party seeking an award under that statute must submit its application within thirty days of final judgment in the action. A final judgment has not yet been entered in this case. *See id.* § 2412(d)(2)(G); *Melkonyan v. Sullivan,* 501 U.S. 89, 96, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991). Plaintiffs' EAJA application is premature. It is dismissed without prejudice.

■ Even assuming plaintiffs' application was timely, the court notes that they would not be entitled claim attorney fees as they appear *pro se. See Phillips v. GSA,* 924 F.2d 1577, 1583 (Fed.Cir.1991); *accord Naekel v. Dep't of Transportation,* 845 F.2d 976, 981 (Fed.Cir.1988).

*The Administrative Offset*

■ It is not clear from the record whether the agency has already effectuated an administrative offset against the Boers' outstanding loan account. If it has not, and seeks to have the court reduce the amount of

---

5. Plaintiffs' citation to 5 U.S.C § 504 appears to be in error. That section relates to an administrative agency's authority to grant attorney fees and costs to a prevailing party.

what would otherwise be the judgment in this case to zero to reflect the offset decision, that offset would clearly be a compulsory counterclaim. *See* 28 U.S.C. § 1503 ("[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any set-off or demand by the United States against any plaintiff in such court."); *Id.* § 2508 (upon trial of any suit in which the United States asserts any set off counterclaim or other demand, "the court shall hear and determine such claim or demand both for and against the United States and plaintiff"); RCFC 13 (compulsory counterclaims). The merits of the offset would not be litigated here, however, as an appeal from the NAD decision to challenge an offset lies in the district court. *See* 7 U.S.C. § 6999 (final determinations of the NAD "shall be reviewable and enforceable by any United States district court").

A right of offset belongs "to every creditor, to apply the appropriated moneys of his debtor, in his hands, in extinguishment of the debts due him." *United States v. Munsey Trust Co.*, 332 U.S. 234, 239, 108 Ct.Cl. 765, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947). This includes the government. *Id.* In addition to this common law right to assert an offset, the government also may collect debts pursuant to the Debt Collection Improvement Act of 1996(DCA), 31 U.S.C. §§ 3716 *et seq.* In pertinent part, 31 U.S.C. § 3716, provides:

(a) After trying to collect a claim from a person under section 3711(a) of this title, the head of an executive or legislative agency may collect the claim by administrative offset. The head of the agency may collect by administrative offset only after giving the debtor:

(1) written notice of the type and amount of the claim, the intention of the head of the agency to collect the claim by administrative offset, and an explanation of the rights of the debtor under this section;

(2) an opportunity to inspect and copy the records of the agency related to the claim;

(3) an opportunity for a review within the agency of the decision of the agency related to the claim; and

(4) an opportunity to make a written agreement with the head of the agency to repay the amount of the claim.

The USDA has established regulations for administrative offsets, which require the agency to adopt the collection procedures outlined in 31 U.S.C. § 3716. *See* 7 C.F.R Subtitle A, Part 3, Subpart B; 7 C.F.R Part 1951, Subpart 1951–C (1996).

On August 28, 1997, the FSA notified the Boers by certified mail of its intent to use an administrative offset to collect on plaintiffs' unpaid FmHA loans. In this letter, the FSA informed the Boers of the amount owed and their rights under the DCA and the applicable regulations. The agency also informed plaintiffs of its intent apply any payments plaintiffs received from any federal program against the loan balances. Plaintiffs challenged that decision, and it was ultimately affirmed by the NAD on August 11, 1998. The NAD held that FSA properly followed the administrative offset provisions of 31 U.S.C. § 3716. Plaintiffs have not sought review by district court.

In the interest of justice the court permitted defendant to assert the offset by filing an answer and counterclaim. The court finds that this is not prejudicial to plaintiffs. They have been aware for several years of the parallel proceeding to accelerate outstanding loans and to assert those deficiencies as an offset in the event of a recovery here. We thus conclude that the FSA possesses the right to apply an offset, both at common law and by statute. Accordingly, defendant's offset is allowed.

## CONCLUSION

The court has thoroughly reviewed the record and finds no basis for overturning the agency's decision on remand. The FSA's DIPP benefit calculation is well founded. Plaintiffs have not shown that the agency's findings of fact and conclusions of law are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law. The agency's decision on remand awarding plaintiffs $31,872.09 in DIPP benefits is thus affirmed. Plaintiffs' request for interest is denied. Plaintiffs' EAJA application is dis-

missed without prejudice. Defendant is hereby allowed an offset pursuant to 31 U.S.C. § 3716 in the total amount of $31,-872.09. This amount will be deducted from plaintiffs' DIPP award of the same amount leaving a zero balance due plaintiffs. The Clerk of the Court shall enter judgment accordingly. Costs to plaintiffs.